## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIA COSTA, *individually*, and MARIO SOARES, *individually and on behalf of all others similarly situated*, | Case No. |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| FCA US LLC f/k/a Chrysler Group LLC, a Delaware Corporation, inclusive, and GRAMMER INDUSTRIES, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Mario Soares, individually and on behalf of all other persons similarly situated, and Maria Costa, based upon personal knowledge of himself and his own actions, as well as based upon information and belief and investigation of his counsel, alleges as follows against Defendants FCA US LLC f/k/a Chrysler Group LLC ("FCA") and Grammer Industries, Inc. ("Grammer" and, collectively, "Defendants").

## NATURE OF THE ACTION

1.      This case concerns defective headrests—known as Active Head Restraint ("AHR") Systems—which were manufactured by Grammer and installed in vehicles sold or leased by FCA. Consumers, like Plaintiff Mario Soares and his wife, Maria Costa, purchased or leased a car from FCA, but were not told by FCA or Grammer about the critical safety defect present in the vehicle: the headrests unexpectedly burst open, with great speed and force, striking drivers and passengers in the back of the head and causing injuries, driver distraction, and potential vehicle crashes. Despite the fact that millions of FCA vehicles nationwide are equipped with these defective

headrests, which threaten the safety of potentially millions of drivers and their passengers, neither FCA nor Grammer alerted consumers to the risks associated with the AHR Systems.

2. In 2010, FCA began outfitting certain of its vehicles with Grammer-manufactured AHR Systems, which, when working properly, mitigate the risk of whiplash to drivers and passengers. An AHR System is made up of two padded sections: a front and a back. Two springs sit between these two sections. The front padded portion of the headrest contains a plastic bracket, called the "sled," which contains a metal rod—a "striker pin." The back padded portion of the headrest contains a hook that is connected to a sensor. When the headrest is un-deployed, or "loaded," the springs in the middle of the headrest portions are compressed, and the hook in the back portion grabs the striker pin in the front portion. This holds the headrest together and keeps it in place.

3. When the sensor within the AHR detects a rear-end impact, the hook releases the striker pin, and the front portion of the headrest deploys, in order to catch the head of the seated person. This deployment launches the headrest forward at a speed of 67 miles per hour and with a force of approximately 120 pounds. AHR Systems in all of the FCA vehicles relevant to this case contain identical hook-and-pin configurations. They are constructed based on the same design, use contain identical parts—including the sled, striker pins, and springs—and are made with identical materials.

4. Unfortunately for Plaintiffs, and consumers like them, a defect in the AHR systems associated with the striker pins and the plastic sled cause the headrests to suddenly, and unexpectedly deploy absent a rear-end collision. These unanticipated deployments are caused by the use of a weak plastic polymer for the sled, and its negative interaction with a chemical compound present in a coating on the striker pins. The plastic polymer is not robust enough to

withstand interaction with the compound.  When the compound on the striker pin contacts the plastic polymer, and is subject to the pressure of the "loaded" headrest, it produces cracks in the plastic.  This is called "environmental stress cracking" or "ESC."

5.      Eventually, ESC degrades the plastic in the sled so thoroughly that the sled cannot withstand the pressure of the spring-loaded headrest.  The sled breaks apart, causing the headrest to explode forward.  Below are photos of an in-tact AHR system and a failed system.



Good AHR
Housing intact and latch pin in housing

Bad AHR
Housing fractured and pin in latch

6.      The AHR failures occur when the car is in normal operation, without any collision. The deployment causes the headrests to crash into the head of the driver or passenger and creates a loud gunshot-like sound, which can startle and distract the driver, resulting in car crashes.

7.      In fact, at all times relevant to this complaint, FCA and Grammer knew, or should have known, that the AHR Systems were defective and posed a risk to consumers and the public. Nevertheless, they represented that the AHR Systems, and the vehicles outfitted with those systems, were safe.

8.    Moreover, FCA and Grammer have refused to accept responsibility for the defective headrests.   Instead, FCA routinely accuses consumers of tampering with the AHR System, and demands that the consumer cover the costs of the AHR repair—the costs of which can exceed $800, a cost beyond the affordability of many consumers.   Consumers who are unable to meet FCA's price are left to drive without a headrest, with a deployed headrest, or using ropes or other fasteners to provide a makeshift mechanism to keep the headrests together.   Each of these options presents additional safety hazards to drivers and passengers, the dangers of which FCA and Grammer are aware.   When FCA does repair an AHR System, it merely replaces the deployed defective headrest with an un-deployed, but still defective, headrest.

9.    As a direct and proximate result of FCA and Grammer's conduct, a defective headrest unexpectedly deployed while Plaintiff Maria Costa was driving the 2015 Jeep Grand Cherokee owned by her husband, Plaintiff, Mario Soares.   Ms. Costa was not involved in a rear-end collision or any other accident that would have initiated the AHR deployment.   The headrest struck Ms. Costa in the back of the head.   As a result of this unanticipated deployment, Ms. Costa has suffered chronic, severe headaches and neck pain.   She has brought this complaint against FCA and Grammer for negligence and strict products liability.

10.    Further, in light of FCA's and Grammer's acts and omissions, Plaintiff Mario Soares, on behalf of himself and all others similarly situated, brings claims against Defendant for consumer fraud, common law fraud, unjust enrichment, breach of implied warranty of merchantability, and breach of express warranty.

**PARTIES**

11.    Representative and individual Plaintiff Mario Soares is, and at all relevant times was, a citizen of the Commonwealth of Massachusetts, residing in Fall River, Massachusetts.

12.     Individual Plaintiff Maria Costa is a citizen of the Commonwealth of Massachusetts, residing in Fall River, Massachusetts.

13.     Defendant FCA US LLC f/k/a Chrysler Group LLC is a Delaware limited liability corporation with its principal place of business in Auburn Hills, Michigan.  FCA US is the U.S. subsidiary of Italian multinational automaker Fiat, S.p.A.  FCA US LLC is formerly known as Chrysler Group LLC.  FCA US is in the business of designing, testing, manufacturing, selling, and supporting the Vehicles that are the subject of this complaint.  FCA US LLC does business nationwide.  For the remainder of this complaint FCA US LLC is referred to as "FCA."

14.     Defendant Grammer Industries, Inc. is a South Carolina corporation with its principal place of business in Troy, Michigan.  Grammer is in the business of developing and manufacturing automotive interior components, including the headrests that are the subject of the instant action.  Grammer sells these components to vehicle manufacturers, such as FCA, who then install the components in their vehicles and sell these vehicles in the Commonwealth—including in this District—and throughout the United States.  For the remainder of this complaint Grammer Industries, Inc. is referred to as "Grammer."  Grammer and FCA are collectively referred to as "Defendants."

**JURISDICTION & VENUE**

15.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified as 28 U.S.C. § 1332(d)(2), because the claims of the proposed Class Members exceed $5,000,000 and because Defendants are citizens of different states than Plaintiffs and Class Members.

16.     The Court has personal jurisdiction over FCA and Grammer because both Defendants regularly conduct business in this District and/or under the stream of commerce

doctrine by causing products to be sold in this District, including the subject Vehicles and the AHR Systems installed in those Vehicles.

17.     Venue is proper because a substantial portion of the events complained of occurred in this District and this Court has jurisdiction over Defendants.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

18.     In 2010, FCA began equipping its vehicles with AHR systems in order to protect against whiplash injuries in the event of a rear-end collision.  FCA installed these headrests in millions of vehicles sold throughout the United States, including in this District and the rest of the Commonwealth of Massachusetts.  Millions of these vehicles remain on the road.

19.     Grammer designed and manufactured the AHR Systems that FCA installed in its vehicles, and which are at issue in this action, and supplied them to FCA with the intent and knowledge that the headrests would be installed in FCA vehicles that would be sold in the United States and in this District.

20.     The vehicles that are equipped with the defective AHR Systems and are therefore relevant to this action (collectively, "Vehicles" or "Subject Vehicles") include:

- 2010-2018 Dodge Journey

- 2010-2011 Dodge Nitro

- 2010-2012 Jeep Liberty

- 2010-2017 Jeep Patriot or Compass

- 2010-2012 Dodge Caliber

- 2010-2018 Dodge Caravan

- 2010-2018 Town & Country

- 2011-2018 Dodge Durango

- 2011-2018 Jeep Grand Cherokee

- 2010-2014 Sebring/Avenger

- 2010-2014 Chrysler 200

21.     In promotional materials and advertising, FCA repeatedly touts its dedication to safety, with respect to the design and manufacture of its Vehicles.  For instance, in the brochures advertising its Jeep vehicles, FCA proclaims that the vehicles have "over 70 available safety and security features" and that "beneath the surface of the Jeep Grand Cherokee lies a work of safety . . . systems that give you confidence behind the wheel and help protect you and your passengers." In advertising the Chrysler 300, FCA asserts that these Vehicles "have 80+ standard and available safety features" and are "Equipped to Protect."  The brochure advertising the Town and Country states that FCA's "care for future generations meet[s] your safety standards."

22.     The AHR Systems installed in the Subject Vehicles constitute one of the critical safety features promoted by FCA.  As explained above, these headrests were designed to prevent or reduce injuries to the Vehicle driver and passengers in the event of a rear-end collision.  When functioning properly in the manner described above, the headrests' forward deployment protects the passenger from suffering whiplash injuries when the car has been hit from behind.

23.     However, despite the performance and safety claims that FCA makes, some of which were described above, the common defect that causes the breakdown, cracking, and eventual failure of the plastic in the AHR sled—ultimately resulting in unanticipated deployment while the Vehicle is in normal operation—renders these headrests unsafe for drivers and passengers, and is a hazard to the community.  The speed and force of the exploding headrest

striking passengers can cause injuries to the head, neck, and shoulders; cause mild traumatic brain injuries; startle drivers; and cause distraction for drivers, leading to crashes.

24.     A reasonable consumer would consider the existence of this defect in the subject Vehicles material in deciding whether to purchase or lease a Vehicle.  Had Plaintiff Mario Soares and other Class Members known about the defective AHR System, they would not have purchased or leased their FCA Vehicles, and/or they would have paid less for them.  As a result of Plaintiff Mario Soares and Class Members' reliance on FCA's material misrepresentations and/or omissions, Plaintiff Mario Soares and the Class have suffered ascertainable loss of money and/or property and/or loss of value in their vehicle.

25.     Reasonable consumers, like Plaintiff Mario Soares and Class Members, expect and assume that a vehicle's headrest will not suddenly and unexpectedly deploy and strike them in the head while driving on the highway, or under any other normal driving conditions.  Plaintiff Mario Soares and the Class would also be reasonable in assuming that Grammer would not provide FCA with known safety defects, and that FCA would not sell or lease vehicles with known safety defects.  Further, reasonable consumers like Plaintiff Mario Soares and Class Members would expect that Defendants would disclose to consumers any defects upon learning of those defects.  Plaintiff Mario Soares and Class Members would also be reasonable in assuming that Defendants would not fail to disclose any defects, would not persistently deny the existence of defects, and would not charge consumers hundreds of dollars to address those defects.

26.     The problem with the sudden and unexpected deployment of headrests in the subject Vehicles is widespread, and has potentially impacted millions of Vehicles nationwide, including in the Commonwealth of Massachusetts and in this District.  In just a three-year period prior to October 2018, consumers lodged approximately 94 complaints with the National Highway

Traffic Safety Administration (NHTSA) related to AHR System malfunctions. In 35 of the cases, Vehicle owners reported that they were driving their Vehicle on a highway when the incident occurred.  In 25 cases, Vehicle owners expressly noted that the malfunction was caused by the failure of the plastic bracket within the headrest.  In 15 cases, owners reported head, face, or neck injuries caused by the headrest striking the Vehicle's driver or passenger.  Many of the reports indicate that FCA was expressly advised of the issue but failed to cover the cost of repair or offer any type of remedy to the consumer.  The following are examples of some of this NHTSA complaints received by Defendants:

- 9/2/15 - THE CONTACT OWNS A 2011 DODGE JOURNEY. THE CONTACT STATED THAT WHILE IN PARK, THE DRIVER SIDE SRS ON THE HEAD REST INADVERTENTLY DEPLOYED. AS A RESULT, THE CONTACT SUSTAINED HEAD INJURIES THAT REQUIRED MEDICAL ATTENTION. THE VEHICLE WAS TAKEN TO A DEALER, BUT WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE MANUFACTURER SENT AN INSPECTOR TO INSPECT THE VEHICLE. THE FAILURE MILEAGE WAS 99,000.

- 6/8/15 - THE CONTACT OWNS A 2011 JEEP COMPASS. WHILE DRIVING APPROXIMATELY 30 MPH, THE CONTACT STATED THAT THE DRIVER SIDE HEAD REST SEPARATED. THE HEAD REST STRUCK THE CONTACT'S NECK AND HEAD, CAUSING THE CONTACT TO SUFFER A DISLOCATED NECK. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE HEAD REST PLASTIC BASE SEPARATED DUE TO DEFECTIVE PLASTIC. THE HEAD REST WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE FAILURE MILEAGE WAS 74,519.

- 2/5/17 - WHILE DRIVING IN THE CITY GOING 45MPH THE PASSENGERS HEADREST RESTRAINT SYSTEM RANDOMLY EXPLODED/ACTIVATED, PUSHING MY WIFE'S NECK DRASTICALLY FORWARD.THIS INCIDENT COULD OF CAUSED SERIOUS BODILY INJURIES AS MY WIFE HAS A CERVICAL LAMINECTOMY DUE TO A SPINAL CORD TUMOR. THIS RANDOM EJECTION OF THE HEADRESTRESTRAINT COULD OF ENDED BADLY.WE TOOK THE VEHICLE TO THE DODGE DEALERSHIP WHERE THEY DETERMINED THAT THE PLASTIC LATCH THAT HOLDS THE RESTRAINT IN PLACE WAS BROKEN CAUSING THE RESTRAINT TO ACTIVATE. WE WERE TOLD THAT OUR EXTENDED WARRANTY WOULD NOT COVER THIS MANUFACTURER DEFECT (THAT'S

EXACTLY WHAT IT IS, A MANUFACTURER DEFECT). WE PURCHASED THE VEHICLE WITH ONLY 10 MILES ON IT AND SINCE THE VEHICLE NOW HAS 43,000 MILES ON IT THE MANUFACTURERS WARRANTY IS EXPIRED. THIS ISSUE IS TRULY OF GREAT CONCERN AS IT COULD CAUSE SERIOUS INJURIES. I BELIEVE A RECALL SHOULD TAKE PLACE. THIS VEHICLE HAS NEVER BEEN IN ANY TYPE OF ACCIDENT NOR ANY SITUATION THAT WOULD OF CAUSED AND IMPACT TO BRAKE THIS RESTRAINT SYSTEM. I URGE FOR THIS ISSUE TO BE INVESTIGATED AS THROUGH MY RESEARCH I HAVE COME ACROSS MANY DODGE DURANGO OWNERS THAT HAVE EXPERIENCED SIMILAR ISSUES WITH THE RANDOM DEPLOYMENT OF THE HEADREST RESTRAINT SYSTEM.

- 6/24/17 - MY WIFE AND I WERE DRIVING DOWN THE ROAD WHEN THE PASSENGER SIDE ACTIVE HEADREST DEPLOYED. WHEN IT DEPLOYED IT HIT HER IN THE BACK OF THE HEAD AND GAVE HER WHIPLASH. I RESEARCHED IT ONLINE AND IT APPEARS THAT THIS IS A COMMON PROBLEM WITH DODGE VEHICLES. I ATTEMPTED TO RESET THE SPRING LOADED ACTIVE HEADREST TO DISCOVER THAT THE REASON IT HAD DEPLOYED IS BECAUSE THE PLASTIC RETAINING PIN RECEIVER WAS BROKEN. I HAVE ATTEMPTED TO CONTACT DODGE (CASE#32447405) WITH NO RESOLVE. I FEEL LIKE THE HEADREST SHOULD CERTAINLY BE RECALLED. IF AN OLDER PERSON HAD BEEN HIT IN THE HEAD OR IF IT WERE ON THE DRIVERS SIDE OF THE VEHICLE IT MAY HAVE CAUSED SERIOUS INJURY, A CRASH, OR DEATH. I CAN EMAIL PHOTOS UPON YOUR REQUEST. YOUR PURSUIT OF THIS MATTER WOULD BE GREATLY APPRECIATED.

- 3/16/17 - THE DRIVER HEAD REST DEPLOYED WHILE DRIVING ON THE HIGHWAY, STRIKING THE DRIVER IN THE BACK OF THE HEAD, CAUSING MOMENTARY LOSS OF CONTROL OF THE VEHICLE, BUT NO ACCIDENT. THE HEAD REST WILL NOT GO BACK INTO NORMAL NON-DEPLOYED POSITION AFTER FOLLOWING THE ON-LINE INSTRUCTIONS FOR RE-SETTING THE HEAD REST. AFTER CHECKING ON THE INTERNET FOR OTHER SUCH PROBLEMS OR RECALLS, FOUND THAT CHRYSLER DEALERS REFUSE TO CLASSIFY THIS AS A MANUFACTORING PROBLEM AND WILL ONLY REPAIR THIS PROBLEM AT OWNERS EXPENSE. I SAW THAT MULTIPLE OTHER OWNERS OF THE 2013 TOWN AND COUNTRY ALSO HAD THIS PROBLEM. PLEASE INVESTIGATE THIS PROBLEM, I BOUGHT THIS VEHICLE BRAND NEW FROM A CHRYSLER DEALER.

- 8/14/17 - IN AUGUST 2017 I CAME OUT TO GET INTO THE CAR AND THE DRIVERS SIDE HEADREST . . . DEPLOYED OVERNIGHT. NEXT DAY WE WERE SITTING IN THE CAR WAITING FOR FOOD TO BE DELIVERED AND THE PASSENGER SIDE HEADREST DEPLOYED STRIKING MY DAUGHTER IN THE FACE HARD ENOUGH TO LEAVE A BRUISE.

HEADREST WILL NOT RESET AND DEALERSHIP STATES THAT IT IS A MANUFACTURER DEFECT BUT WILL NOT REPLACE THEM. VEHICLE WAS AT 80000 MILES AT THE TIME SO NO LONGER UNDER FULL WARRANTY, BUT THE MANUFACTURER SHOULD HAVE TO REPLACE FAULTY SAFETY EQUIPMENT REGARDLESS.

- 10/16/17 - I WAS PARKED IN MY DRIVEWAY (AS I JUST GOT HOME FROM WORK) TALKING TO MY DAUGHTER AND HER FATHER (WHO WERE PARKED TO MY DRIVERS SIDE GETTING READY TO LEAVE IN ANOTHER VEHICLE) WHEN WE ALL HEARD A LOUD NOISE AND SOMETHING HIT THE SIDE OF MY HEAD VERY HARD. THE ACTIVATED HEAD REST SHOT OPEN FOR NO REASON AT ALL. THE CAR WAS IN PARK AND NOBODY WAS IN THE VEHICLE EXCEPT FOR ME.  THERE WAS NO IMPACT OR ANYONE TOUCHING THE OUTSIDE OF THE VEHICLE EITHER. I AM FORTUNATE THAT I WAS NOT DRIVING AT THE TIME THIS HAPPENED AS THIS COULD HAVE CAUSED AN ACCIDENT WITH THE IMPACT OF THE HEADREST HITTING MY HEAD.

- 5/13/17 - PASSENGER SIDE FRONT ACTIVE HEADREST DEPLOYED ON ITS OWN, (NO COLLISION, OR IMPACT) WHILE AT A COMPLETE STOP AT A TRAFFIC LIGHT, SOUNDED LIKE A GUN SHOT, ADULT PASSENGER IS SUFFERING WITH WHIPLASH, AND TERRIFIED TO RIDE IN MY JEEP AGAIN.

- 8/24/17 - MY WIFE WAS DRIVING THE VEHICLE WHEN THERE WAS AN EXPLODING SOUND IMMEDIATELY FOLLOWED BY HIT TO THE BACK OF HER HEAD. SHE IS CURRENTLY IN A LOT OF PAIN FROM HER NECK AND HAS A NICE HEADACHE TO ACCOMPANY IT. THE VEHICLE WAS IN MOTION WHEN THE HEADREST DEPLOYED ON IT OWN.

- 3/6/17 - THE ACTIVE HEAD RESTRAINT (HEADREST) OF MY JEEP DEPLOYED WHILE DRIVING DOWN THE HIGHWAY CAUSING ME TO SWERVE INTO THE OTHER LANE. LUCKILY, THERE WEREN'T ANY CARS IMMEDIATELY AROUND ME SO I WAS ABLE TO REGAIN CONTROL AND CONTINUE ON WITHOUT INJURY. I BELIEVE THIS COULD BE A VERY DANGEROUS DEFECT IN OTHER SITUATIONS. THE ACTIVE HEAD RESTRAINT IS INTENDED TO GO OFF IN A COLLISION TO PREVENT WHIPLASH FROM AIRBAG DEPLOYMENT AS FAR AS I UNDERSTAND. MY VEHICLE WAS NOT IN AN ACCIDENT OR TOUCHED IN ANY WAY, SIMPLY TRAVELING STRAIGHT DOWN THE HIGHWAY. THIS WAS CONFIRMED BY AN INSPECTION AT THE LOCAL JEEP DEALERSHIP.

- 7/26/17 - ON 7/26/17 I WAS DRIVING ON A LOCAL ROAD IN EASTCHESTER NY GOING UNDER 25 MPH WHEN THE HEADREST RESTRAINT DEPLOYED AND INJURED THE BACK OF MY HEAD. WENT TO ER AND NEED TO SEE A SPECIALIST FOR INJURY. CONTACTED

DODGE/CHRYSLER AND WAS TREATED LIKE I WAS AT FAULT. LEASE DEALER STEPPED IN AND VERIFIED THERE WAS NO COLLISON. DODGE HAS AN ENGINEER SCHEDULED TO INSPECT IT 7/31/17. WAS TOLD TO GO THROUGH MY INSURANCE FOR INJURIES BUT THERE WAS NO COLLISION!!

- 9/28/17 - WHILE DRIVING ON THE HIGHWAY SOMETHING EXPLODED LOUD INSIDE THE CAR. I SCREAMED AND AT THE FRONT PASSENGER'S SEAT, I SAW MY DAUGHTERS HEAD AND BODY MOVING FORWARD AS SHE WAS IMPACTED BY THE SEAT. THEN I NOTICED THAT THE HEADREST POPPED AND HIT MY DAUGHTER STRONGLY IN THE HEAD. I WENT RIGHT AWAY TO BIG O DODGE 2645 LAURENS RD, GREENVILLE, SC 29607. THE TECHNICIAN LOOKED AT THE HEADREST AND TOLD ME TO MAKE AN APPOINTMENT BECAUSE THEY WERE TOO BUSY. THEY GAVE ME AN APPOINTMENT FOR A WEEK LATER AND ALSO TOLD ME TO CALL CHRYSLER 800-992-1997 TO SEE IF THEY COVER THE PART. I TALKED TO ARIANA GONZALEZ 9:45AM AND SHE SAID SHE WAS GOING TO CALL BIG O DODGE TO VERIFY WHAT CAN BE DONE, BUT SHE NEVER CALLED ME BACK. I CALLED AGAIN CHRYSLER AND TALKED TO JOEL AND HE SAID THEY CAN'T DO ANYTHING ABOUT IT UNTIL THE CAR IS DIAGNOSED. I EMPHASIZED THAT THIS IS REALLY DANGEROUS AND THAT I AM AFRAID THAT THIS HAPPENS TO MY DRIVER'S SEAT WHILE I AM DRIVING. THIS IS A GREAT SAFETY HAZARD. IF THIS EXPLODES IN THE DRIVER'S SEAT WHILE DRIVING IT CAN CAUSE AN ACCIDENT. THIS IS MY DAILY USE VEHICLE AND I NEED THIS TO BE SOLVED RIGHT AWAY, AND PREVENT MANY OTHER PEOPLE USING DOGDE FROM BEING HARMED.

- 7/7/17 - I WAS DRIVING ON THE HIGHWAY AND SUDDENLY I WAS HIT IN THE BACK OF THE HEAD. AT FIRST I THOUGHT I WAS HIT BY ANOTHER CAR BUT I LOOKED AROUND AND THERE WAS NO CARS AROUND. I PULLED OVER AND LOOKED AT MY HEADREST AND IT EXPLODED AND HIT ME IN THE HEAD. I CALLED AND BROUGHT MY CAR IN TO JEEP WHO SAID IT WAS THE ACTIVE HEAD RESTRAINT AND IT IS SET TO GO OFF DURING AN ACCIDENT. I TOLD THEM I WAS NOT IN ANY ACCIDENT. I THEN CALLED JEEP DIRECTLY WHO TOLD ME THEY WOULD INVESTIGATE THE ISSUE AND THAT I SHOULD LEAVE MY CAR AT JEEP. THAT WAS 3 WEEK AGO. ALL OF MY ATTEMPT TO CONTACT JEEP TO HAVE THEM RECTIFY THE ISSUE AND REPLACE MY HEADREST HAVE GONE NO WHERE. I HAVE NOT RECEIVED ANY CALL BACKS AND EVERY TIME I CALL THEM THEY TELL ME THERE IS NOTHING THEY CAN DO EXCEPT WAIT UNTIL I AM CONTACTED BY JEEP. THIS IS A BIG SAFETY ISSUE AS I COULD HAVE RUN OFF THE ROAD AN[D] CRASHED.

- 1/27/18 - I WAS COMING TO A GRADUAL STOP AT A TRAFFIC LIGHT ON A LOCAL ROAD WHEN THE ACTIVE HEAD RESTRAINT SEEMINGLY DEPLOYED. I WAS NOT IN A COLLISION AND THERE WAS NO REASON FOR IT TO DEPLOY. UPON EXAMINING THE MECHANISM IT WAS NOT TRIGGERED, RATHER IT FAILED BECAUSE THE PLASTIC CLIPS THAT HELD ONTO THE LATCH HAD BROKEN OFF INTERNALLY CAUSING THE HEADREST TO HIT ME VIOLENTLY IN THE BACK OF THE HEAD. THIS COULD HAVE BEEN FAR WORSE HAD I NOT BEEN ALMOST AT A COMPLETE STOP.

- 1/21/18 - DRIVER'S HEADREST DEPLOYED DUE TO THE PLASTIC THAT HOLDS A PIN BROKE INTERNALLY. THIS SPRING LOADED SYSTEM APPARENTLY HAD ENOUGH TENSION THAT IT BROKE THE PLASTIC. MY VEHICLE WAS STATIONARY AND UNOCCUPIED AT THE TIME. IF I HAD BEEN SITTING IN THE VEHICLE MY NECK COULD HAVE BEEN BROKEN. A REPLACEMENT HEADREST IS ABOUT $650, NOT INCLUDING LABOR, ACCORDING TO THE DEALERSHIP AND I WAS TOLD IT IS NOT IN WARRANTY. I HAVE HAD THIS VEHICLE LESS THAN 4YRS.

- 7/1/17 - THE PASSENGER SIDE SAFETY HEADREST DEPLOYED WHILE DRIVING FULL SPEED DOWN THE INTERSTATE. APPROX. 75 MPH. THE SOUND WAS SO SUDDEN IT STARTLED ME AND ALMOST CAUSED ME TO WRECK. NOW THE HEADREST WILL NOT "POP" BACK INTO POSITION AS DOCUMENTED BY DODGE LEAVING THE HEADREST FULLY DEPLOYED AND COMPLETELY USELESS.

- 11/8/17 - THE ACTIVE HEAD RESTRAINT SYSTEM SUDDENLY DEPLOYED WHILE DRIVING NORMALLY ON CITY STREETS, AND WAS NOT INVOLVED IN A COLLISION OF ANY KIND. PLASTIC RETAINING CLIPS NOW VISIBLE INSIDE THE HEADREST APPEAR TO HAVE FAILED, PREVENTING RESETTING.

- 10/31/17 - THE ACTIVE HEAD REST FOR MY 2014 JEEP GRAND CHEROKEE HAD SPONTANEOUSLY DEPLOYED WHILE PARKED IN MY GARAGE. I HAD TAKEN IT TO THE DEALER FOR REPAIR AND I WAS TOLD THE PLASTIC CLIPS WERE BROKEN AND IT COULDN'T BE RESET AND THE HEAD REST NEEDED TO BE REPLACED AT MY EXPENSE. APPARENTLY THIS IS NOT A VEHICLE RECALL ISSUE BUT POSSIBLY SHOULD BE LOOKED INTO AS ONE. I HAVE FOLLOWED UP THIS TYPE OF ISSUE ON THE INTERNET AND FOUND MULTIPLE CASES WITH SIMILAR OR THE EXACT TYPE OF ISSUE. THIS POSES A HUGE SAFETY HAZARD, IF I HAD BEEN DRIVING, AND THE HEADREST DEPLOYED IN THIS MANNER IT COULD HAVE CAUSED A SERIOUS ACCIDENT.

- 8/1/17 - ACTIVE HEADREST ACTIVATED BY ITSELF WITH NO

COLLISION. INSPECTION REVEALED A PLASTIC TAB IS BROKEN. THIS IS KNOWN BY JEEP AS A DEFECTIVE PIECE OF EQUIPMENT. THEY REFUSED TO FIX AS THE CAR IS ~1500MILES OUTSIDE OF WARRANTY.

- 5/1/17 - THE VEHICLE WAS STATIONARY AND PARKED, BUT STILL RUNNING. THE FRONT PASSENGER SEAT WAS UNOCCUPIED AND THERE WAS A LOUD POPPING SOUND AS THE FRONT PASSENGER SEAT HEADREST "EXPLODED." A COUPLE OF PLASTIC PIECES FLEW OUT. THERE WAS NO REASON FOR THE HEADREST TO DEPLOY. I TOOK THE CAR TO THE JEEP DEALER AND THEY SAID THE HEADREST WAS "DEFECTIVE" BUT COULDN'T DO ANYTHING ABOUT IT AS THE CAR WAS NO LONGER UNDER WARRANTY, NOR IS THERE A RECALL FOR THE PROBLEM. THE CAR HAD UNDER 50K MILES ON IT AND WAS UNDER TWO YEARS OLD, AND HAD NEVER BEEN IN AN ACCIDENT.

- 9/9/17 - DRIVING ON HIGHWAY CAR IN MOTION WHEN PASSENGER HEADREST DEPLOYED HITTING PASSENGERS HEAD PUSHING THEM INTO DASHBOARD. TAKEN TO ADDYS DODGE AND WAS TOLD IT WAS BROKE AND NEEDED A NEW HEADREST FOR $790.00 THAT HEADREST WAS NOT UNDER WARRANTY AND ASKED FOR $ 98.00 FOR THE[IR] INSPECTION.

- 9/27/17 - I WAS WONDERING IF A SAFETY DEVICE IN A CAR HEADREST, DESIGNED TO JUMP FORWARD IN A REAR END COLLISION, IS A SAFETY DEVICE THAT FALLS UNDER WARRANTY. MY WIFE HAD ONE THAT MALFUNCTIONED IN HER 2014 CHRYSLER 200. THERE WAS NO REAR END COLLISION. SHE STOPPED AT AN INTERSECTION IN A MALL PARKING LOT. THE HEADREST DEPLOYED, THROWING HER FORWARD INTO THE STEERING WHEEL. CHRYSLER IS SAYING THAT SINCE HER CAR IS NO LONGER UNDER WARRANTY SHE WILL HAVE TO PAY FOR THE REPLACEMENT OF THIS FAULTY PART. MODELS UP TO 2013 WERE RECALLED FOR THE SAME . . . IN THE HEADRESTS, BUT 2014 WERE NOT RECALLED.

- 9/8/17 - AFTER MAKING A LEFT TURN AT AN INTERSECTION, THE PASSENGER SIDE ACTIVE HEADREST DEPLOYED. NO OTHER SAFETY SYSTEMS ACTIVATED, AND NO WARNING LIGHTS APPEARED ON THE DASH. THE DRIVER-SIDE HEADREST DID NOT DEPLOY. SPEED WAS LESS THAN 30 MPH. LOOKING AT THE HEADREST, IT APPEARS THAT THE PLASTIC CLIPS THAT HOLD IT IN PLACE FAILED, CAUSING THE DEPLOYMENT. SEE THE ATTACHED PHOTOGRAPHS. THE VEHICLE HAD 38,402 MILES AT THE TIME OF THE INCIDENT.

- 6/20/17 - MY DRIVER SIDE HEADREST DEPLOYED ON ITS OWN WHILE DRIVING DOWN THE ROAD. THE VEHICLE HAS NEVER BEEN IN AN ACCIDENT AND IT IS ONLY 3 YEARS OLD. THE DEPLOYMENT ALMOST

CAUSED ME TO WRECK BUT I WAS ABLE TO MAINTAIN MY VEHICLE TO COME TO A STOP IN THE OTHER LANE. I HAVE CONTACTED THE DEALER AND DODGE WITH NO HELP. THE[IR] EQUIPMENT MALFUNCTION AND I HAVE TO PAY $684 TO HAVE IT REPAIRED. KEEP IN MIND IT IS SUPPOSE TO DEPLOY IN A REAR END COLLISION AND THERE WAS NO COLLISION. IT WAS A SPONTANEOUS DEPLOYMENT.

- 5/21/17 - 2015 GRAND CARAVAN MY WIFE MICHELLE O'CONNELL DRIVE IN PULLING INTO OUR DRIVEWAY AND THE HEADREST RESTRAINT SYSTEM AIRBAG DEPLOYED STRIKING MY WIFE IN THE BACK OF THE HEAD VAN WAS TOWED TO BLACK CHRYSLER DODGE RAM IN STATESVILLE NORTH CAROLINA TO BE REPAIRED MY WIFE SOUGHT MEDICAL ATTENTION CHRYSLER THEN DEMANDED THE VEHICLE BE INSPECTED BY AN INDEPENDENT INSPECTOR TO SEE IF IT WAS IN AN ACCIDENT AFTER THE REPORT WAS DONE IN RECEIVED CHRYSLER NOTIFY THE DEALER DO NOT TOUCH THE VEHICLE THE REPORT SAID THE VEHICLE WAS FLAWLESS WHICH WE KNEW THAT THEN CHRYSLER'S LAWYER CONTACTED US AND SAID WE ARE NOT FIXING YOUR VEHICLE UNTIL YOU SIGN PAPERWORK ABSOLVING US OF ANY LIABILITY WHICH THEY KNOW THEY'RE LIABLE CUZ THE VAN IS IN PERFECT CONDITION WE ARE REPORTING THIS BECAUSE WE BELIEVE THERE IS A KNOWN DEFECT BY CHRYSLER AND THEY'RE TRYING TO SWEEP IT UNDER THE RUG THEY HAD A SIMILAR INCIDENT WHERE THEY HAD TO RECALL 880000 VEHICLES IN 2013 FOR THE EXACT SAME ISSUE CHRYSLER MADE OF DIRECT THREAT SAYING WE'RE NOT GOING TO FIX YOUR VEHICLE AND LEAVE IT ON REGISTERABLE BECAUSE OF THE AIRBAG FOR INSPECTION AND UNUSABLE UNLESS YOU ABSOLVE US OF LIABILITY THE VEHICLE WAS ONLY TRAVELING LESS THAN 2 MILES AN HOUR PULLING INTO OUR DRIVEWAY IT WAS A DRIVER'S SIDE HEADREST RESTRAINT AT DEPLOYED.

- 5/2/17 - THE ACTIVE HEADREST/HEAD RESTRAINT DEPLOYED WHILE DRIVING, HITTING MY WIFE IN THE BACK OF THE HEAD. SHE WAS TRAVELING APPROXIMATELY 30-35MPH. THIS CAUGHT HER OFF GUARD BUT FORTUNATELY DID NOT AFFECT HER DRIVING AND SHE MAINTAINED CONTROL OF THE VEHICLE. THE VEHICLE WAS NOT INVOLVED IN AN ACCIDENT. AFTER INSPECTING THE HEAD RESTRAINT I NOTICED THE PLASTIC THAT APPARENTLY HOLDS A METAL ROD BROKE ALLOWING THE HEAD RESTRAINT TO DEPLOY. IN RESEARCHING THE ACTIVE HEAD RESTRAINT ISSUES, I RAN ACROSS A RECALL FOR CHRYLSER BUT IT DID NOT PERTAIN TO MY MAKE AND MODEL AND IT WAS FOR POSSIBLE NON DEPLOYMENT DURING REAR END COLLISION. SAFETY RECALL N38 /NHTSA 13V-282 ACTIVE HEAD RESTRAINTS

- 4/27/17 - THURSDAY EVENING MY HUSBAND WAS BACKING OUT OF OUR GARAGE AT OUR HOUSE. WHEN HE GOT TO THE STREET (A RESIDENTIAL ROAD) HE PUT THE CAR INTO DRIVE AND THAT'S WHEN THE DRIVER'S HEADREST DEPLOYED (SEPARATED FROM THE PLASTIC PIECE LIKE AN AIRBAG, HEADREST RESTRAINT ACTIVATION THING) HITTING MY HUSBAND IN THE BACK OF THE HEAD FORCEFULLY. HE DID NOT HIT ANYTHING OR RUN OVER ANYTHING WHILE BACKING OUT. NO OTHER AIRBAG DEPLOYED IN THE CAR, JUST THAT ONE. HE PULLED BACK INTO THE GARAGE AND TOLD ME WHAT HAPPENED. WE GOT ON CHRYSLER'S MOPAR WEBSITE TO SEE IF THERE WERE ANY RECALLS REGARDING THAT PART. THERE WERE NO CURRENT RECALLS ON OUR VEHICLE AND WE WERE UP-TO-DATE WITH ALL THE RECALLS ON OUR VEHICLE. WE CONTACTED CHRYSLER SEVERAL TIMES AND GOT NOWHERE WITH THEM, BUT THE FIRST REPRESENTATIVE WE TALKED TO DID GIVE US A CASE NUMBER. THEY ARE BASICALLY SAYING IT IS OUT OF THEIR HANDS AND IN THE DEALERSHIPS. WE THEN CONTACTED THE DEALERSHIP WHERE WE PURCHASED AND SERVICE OUR JEEP. THEY TOLD US TO HAVE IT TOWED THERE AND THEY WILL INSPECT THE PROBLEM. EVEN IF THEY FIX THE PART OR RESET THE AIRBAG THING, I AM STILL SCARED TO DRIVE MY CAR TO AND FROM WORK AND TRANSPORT MY CHILD.

- 9/26/16 - ON SEPTEMBER 26 2016, THE DRIVER'S SIDE HEADREST EXPLODED AND CAME LOSE (FOR NO APPARENT REASON). EXPERIENCING HEADACHE DUE TO THE BUMP ON MY HEAD. DESPITE THE VEHICLE BEING ONLY THREE YEARS OLD, AND WITH JUST 56000 MILES, THE RADIATOR AND AIR CONDITIONING SYSTEMS HAVE BEEN REPLACED! 2013 DODGE AVENGER IS NOT A SAFE CAR TO DRIVE AND NEEDS TO BE THOROUGHLY INVESTIGATED FOR QUALITY AND SAFETY. THE HEADREST EXPLOSION HAPPENED WHILE THE ENGINE WAS OFF AND WAS ABOUT TO EXIT THE VEHICLE INSIDE MY GARAGE.

- 7/31/16 - ON 7/31/2016 MY VEHICLE WAS PARKED IN A DRIVEWAY. I ENTERED THE VEHICLE, STARTED THE ENGINE AND THE DRIVER SIDE ACTIVE HEADREST DEPLOYED. ATTEMPTS TO RESET HEADRESTPER THE OPERATORS MANUAL FAILED. ON 8/4/2016 I TOOK THE VEHICLE TO THE DEALERSHIP WHO INFORMED ME THAT THEY COULD NOT RESET HEADREST AND IT HAD TO BE REPLACED (COST APPROX $900). I CONTACTED DODGE CUSTOMER SERVICE WHO HAS ASSIGNED AN INVESTIGATOR TO LOOK INTO THE ISSUE. CASE # 29846962 AS OF THIS DATE, 8/5, THE REPLACEMENT HEADREST IS ON ORDER AND I AM WAITING TO BE CONTACTED BY THE INVESTIGATOR TO LOOK AT THE VEHICLE. PRIOR TO THE INCIDENT, THE VEHICLE HAD BEEN DRIVEN IN EXCESS OF 500 MILES (NORTHERN VA TO TN) AND HAD BEEN

PARKED AND SECURED IN THE DRIVEWAY FOR APPROX. 1 HOUR. THE VEHICLE WAS NOT, AND HAS NEVER BEEN, IN AN ACCIDENT.

- 8/19/17 - THE PASSENGER SEAT HEAD RESTRAINT SYSTEM ACTIVATED FOR NO KNOWN REASON WHILE DRIVING 70 MPH ON THE INTERSTATE. THE VEHICLE WAS NOT IN ANY ACCIDENT OR NO FACTORS CAUSED THIS. THE HEAD REST VIOLENTLY SHOT FORWARD APPROX 6" IF THIS WOULD HAVE BEEN THE DRIVERS SEAT IT WOULD ALMOST CERTAINLY CAUSED THE DRIVER TO LO[ ]SE CONTROL OF THE JEEP.

- 6/7/17 - WHILE IN PARK, DRIVER WAS LEANING FORWARD TO REACH SOMETHING ON FLOOR WHEN HEAD REST SHOT FORWARD. INSPECTION REVEALED PLASTIC RETAINER HAD BROKEN ALLOWING THE ACTIVE HEAD RESTRAINT TO RELEASE. SAFETY CONCERN IS WHAT IF THIS HAD HAPPENED WHILE DRIVING WITH HEAD NEAR THE HEAD REST?

27.     Despite the obvious defect in the affected Vehicles and Defendants' knowledge of the issue, it continues to use substandard or inadequate plastic material in its AHR system without addressing the problem or disclosing it to their customers.

## II.     FCA's WARRANTY

28.     FCA's Basic Warranty covers "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

29.     As indicated herein, the plastic used in FCA's AHR system is "defective in material" and this defect was present at the time the vehicles "left the manufacturing plant."

## III.     FCA CONCEALED AND CONTINUES TO CONCEAL THE DEFECT FROM CONSUMERS.

30.     At all material times, the potential harm caused by the defective material used in Defendants' AHR system was widely known to the Defendants.  They each had superior and exclusive knowledge of the materials defect and knew or should have known that the defect was

not known or reasonably discoverable by consumers before consumers purchased or leased Vehicles equipped with AHRs.

31.     Specifically, the Defendants acquired their knowledge of the AHR defect prior to the time that Plaintiff Mario Soares purchased his Vehicle and before Plaintiff Maria Costa experienced an unintended deployment. Defendants knew about the defects by or before 2010, and were further notified of the defect by numerous consumer complaints, its own repair database, warranty claims, and the NHTSA complaints referenced above.  In fact, Defendants received notice of thousands of reported failures prior to the date Plaintiff suffered her injuries. Nevertheless, Defendants actively concealed and failed to disclose and continue to fail to disclose this defect to the public.

32.     The Defendants intentionally misrepresented, either affirmatively or by omission, that its Vehicles were free from defects and took no action to adequately warn or remedy the defect, but instead concealed, suppressed, and failed to disclose the potential injuries that could be caused by such materials defects.

33.     In fact, Defendants systematically, purposefully, and fraudulently concealed the defect and misled customers by telling them that any problems in connection with the defect were actually caused by customers' failure to maintain their Vehicles properly and/or by "tampering."

34.     Despite its awareness and actual knowledge of the defect referenced herein and the attendant problems evidenced by, among other things, a significant number of customer complaints, repair orders and warranty claims, the Defendants continue to fail to warn consumers about the issue, or even mention it to them.  To date, they still have not done so, and have actively concealed the defect from the public.

35.     Despite Defendants' notice of the defect from numerous consumer complaints, dealership repair orders, NHTSA complaints, warranty claims, and other sources, it has not recalled vehicles to address the defect, has not offered all of its customers suitable repair, remedial measures, modifications, or replacements free of charge, and has not offered to reimburse the consumers who incurred costs relating to the materials defect and subsequent damage to these vehicles.  As a result of Defendants' conduct alleged herein, Plaintiffs Maria Costa, Mario Soares, and Class Members have been harmed and have suffered actual damages as referenced herein.

## IV.     FACTUAL ALLEGATIONS OF PLAINTIFFS

### *Plaintiff Mario Soares*

36.     Plaintiff Mario Soares owns a 2015 Jeep Grand Cherokee.  In April of 2015, Mr. Soares purchased the Vehicle from Stateline Chrysler Jeep Dodge Ram in Somerset, Massachusetts for personal, non-commercial purposes.  At the time of purchase, the Vehicle was new.

37.     One factor that influenced Mr. Soares' decision to buy the Jeep, rather than another vehicle, was their understanding that that the Jeep was one of the safest SUV's available.  In coming to this understanding and making this choice, they relied in part on FCA's assurances that the Vehicle was safe, along with FCA's advertisements and the materials available on FCA's website concerning the Vehicle's safety features.

38.     If, at the time that he purchased his Jeep, Mr. Soares had been aware of the fact that the 2015 Jeep was outfitted with a defective AHR System, which was composed of weak materials that made the Jeep unsafe to drive, he would not have purchased the Jeep or would have paid significantly less for it.

39.     Mr. Soares has owned his Jeep for approximately five years.  He shares the vehicle with his wife, Plaintiff Maria Costa, who occasionally drives the Jeep.  As detailed below, the

driver-side headrest unexpectedly deployed while Ms. Costa was driving it.  Mr. Soares is now concerned that at any time while he or Ms. Costa are driving and/or riding in the Jeep, the passenger-side AHR System may fail and suddenly deploy.

40.     After the headrest deployed, Mr. Soares and Ms. Costa conducted research to determine if the defendants would cover the cost of replacing both the driver and passenger side headrests.  This research revealed that the defendants have a policy of not covering the cost of replacing either headrest under its warranty.  They also discovered that the cost to them to replace the headrest would likely exceed $1,400.  Because Mr. Soares does not have sufficient funds to cover the costs of replacing the two headrests, he continues to drive the vehicle with a deployed headrest on one side and a defective, non-deployed, headrest on the other that could explode at any moment.

### Plaintiff Maria Costa

41.     On or about February 17, 2020, Ms. Costa was driving the 2015 Jeep Grand Cherokee owned by her husband, Mario Soares.  While Ms. Costa was driving, and without experiencing any collision or other rear-end impact, the AHR System in the Jeep unexpectedly deployed, creating a loud sound.  The headrest hit Ms. Costa in the back of the head and startled her, and caused her to be distracted from the road.

42.     As a result of the deployment, Ms. Costa has suffered chronic migrane headaches and neck pain that continue to this day.

### TOLLING OF THE STATUTE OF LIMITATIONS

43.     Since the AHR defect in the subject Vehicles cannot be detected until the defect manifests, Plaintiff Mario Soares and the Class Members were not reasonably able to discover the problem until after purchasing or leasing their Vehicles, despite the exercise of due diligence.

44.     Plaintiff Mario Soares and the Class Members had no realistic ability to discern the subject Vehicles' AHR defect until after the headrests deploy or deployed.  In addition, despite their due diligence, Plaintiff Mario Soares and the Class Members could not reasonably have been expected to learn or discover prior to the manifestation of the failure that Defendants deceived them, or that Defendants concealed from them material information concerning the AHR Systems. Therefore, the discovery rule is applicable to Plaintiff Mario Soares's and the Class Members' claims.

45.     Moreover, FCA are under a continuous duty to disclose to Plaintiff Mario Soares and the Class Members the true character, quality, and nature of the subject Vehicles and the existence of any safety defects.  Defendants knowingly, affirmatively, and/or actively concealed the true character, quality, and nature of the defect at issue.  Furthermore, Plaintiff Mario Soares reasonably relied upon Defendants' knowing, affirmative, and/or active concealment.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitations defense in this action.

46.     The causes of action alleged herein did or will accrue only upon discovery of the defects referenced herein, Defendants' refusal to cover the repairs of the AHR Systems in the subject Vehicles, and Defendants' fraudulent concealment of the defects.  Plaintiff Mario Soares and the Class Members did not discover and could not have discovered through the exercise of reasonable diligence the true nature of the defects.

## **CLASS ACTION ALLEGATIONS**

47.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

48.     Pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff Mario Soares brings this action against Defendants individually and on behalf of a proposed Class comprised of:

> All persons in Massachusetts who currently own or lease, or who have owned or leased, any of the Subject Vehicles manufactured by FCA or any of its subsidiaries or affiliates that is equipped with an ARH system.

49.     Specifically excluded from the Class are Defendants; Defendants' employees, affiliates, officers, and directors, including franchised dealers; any claims for physical injuries related to the defect at issue in this litigation; and the judicial officer(s) to whom this case is assigned, and the judicial officer(s)' immediate family and legal staff.

50.     Plaintiff Mario Soares reserves the right, subject to additional information obtained through further investigation and discovery, to amend, expand, or narrow the foregoing definition of the Class.

51.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims, and because Plaintiff otherwise meets the requirements of Federal Rule of Civil Procedure 23, as alleged below.

### *Numerosity – Federal Rule of Civil Procedure 23(a)(1)*

52.     The members of the proposed Class are so numerous that their individual joinder herein is impracticable.  Though the exact number and identity is not presently known, these facts can reasonably be ascertained from FCA's records.  On information and belief, millions of the Subject Vehicles have been sold or leased in Massachusetts.

### *Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)*

53.     Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes.  Such common questions of law or fact include, but are not limited to, the following:

    a.      Whether the design and/or materials used in AHR Systems are defective;

    b.      Whether the Subject Vehicles' owners' manuals, written care and maintenance materials, and product labeling sufficiently warn customers about the dangers associated with the Subject Vehicles;

    c.      Whether the AHR system defect constitutes a safety risk;

    d.      Whether Defendants knowingly failed to disclose to and warn consumers of the ARH defect with the intent that consumers rely upon such concealment, suppression, or omission;

    e.      Whether Defendants had a duty to disclose to consumers material facts concerning the serious problems that would inevitably result from the Subject Vehicles' defect;

    f.      Whether Defendants' conduct as alleged herein constitutes a violation of Mass. G. L. Ch. 93A § 2;

    g.      Whether FCA's refusal to repair Vehicles that experienced an AHR failure constitutes a breach of express warranty; and

    h.      Whether FCA's sale of the defective Subject Vehicles constitutes a breach of the implied warranty of merchantability.

54.     Defendants engaged in a common course of conduct giving rise to the legal rights Plaintiff Mario Soares seek to enforce on behalf of himself and the other Class Members.  Similar or identical statutory and common law violations, business practices, and injuries are involved.  These common questions, and the common answers they will generate, predominate in both quality and quantity over any individual issues that may exist.

*Typicality – Federal Rule of Civil Procedure 23(a)(3)*

55.     Plaintiff Mario Soares's claims are typical of the claims of the Class Members, as all Class Members were and are similarly affected by FCA's wrongful conduct complained of

herein.  Plaintiff Mario Soares and each of the Class Members leased and/or owned a Class Vehicle equipped with an AHR system that was manufactured with defective materials such that it causes the Vehicles to be unsafe to drive.

### *Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)*

56.     Plaintiff Mario Soares is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent.  Plaintiff Mario Soares has retained counsel highly experienced in the prosecution of complex class action litigation, and Plaintiff Mario Soares intends to prosecute this action vigorously.  Plaintiff  Soares and his counsel will fairly and adequately protect the interests of all members of the proposed Class.

### *Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)*

57.     Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as requested in the Prayer for Relief below, with respect to the members of the Class as a whole.

### *Superiority – Federal Rule of Civil Procedure 23(b)(3)*

58.     A class action is superior to all other available methods for the fair and efficient adjudication of the rights of each Class member. Joinder of individual Class members is impracticable. Individual litigation would be unnecessarily costly and burdensome and would deter individual claims.  To process individual cases would increase both the expenses and the delay not only to Class members, but also to Defendant and the Court.  In contrast, a class action in this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and

equal protection of the rights of each class member, all by way of the comprehensive and efficient supervision of the litigation by a single court.

59.     Furthermore, this Class may be certified because, *first*, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the proposed Class that would establish incompatible standards of conduct for Defendant; and, *second*, the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

## CAUSES OF ACTION

### Count I
### Violation of Mass. G. L. 93A
### (On Behalf of Plaintiff Mario Soares and the Proposed Class,
### Against All Defendants)

60.     Plaintiff Mario Soares incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 59 above, inclusive, of this Complaint as if fully set forth herein.

61.     Plaintiff Mario Soares and Defendants are each "persons" as defined by Mass. G.L. c.93A, § 1(a).

62.     Defendants had knowledge of the defect(s) as described herein.

63.     In violation of Mass. G.L. 93A § 2, Defendants failed to disclose a material fact to Plaintiff Mario Soares and to Class Members about the quality, condition, and characteristics of the AHR Systems installed in the Subject Vehicles, despite having knowledge of the defective AHR System.

64.     In violation of Mass. G.L. 93A § 2, Defendants misrepresented to Plaintiff and the Class Members, the quality, condition, and characteristics of the Subject Vehicles as safe, despite having knowledge of the defective AHR System.

65.     The fact that consumers were entering into a sale for a Vehicle that was unsafe to drive and poses a safety risk to Plaintiff Mario Soares and the general public is a material fact because a reasonable person would have considered it an important factor in deciding whether to complete the transaction for the subject Vehicle.  Plaintiff Mario Soares would not have purchased his Jeep or would have paid less for the Vehicle had he known of that fact.

66.     As a result of Defendants' unfair business practices, including by Defendants' misrepresentations and non-disclosures, Plaintiff Mario Soares and the Class Members have been injured and sustained damages, including, among other things:

    a.     Plaintiff Mario Soares and Class Members would not have paid for the subject Vehicles or would have paid substantially less had they known the Vehicles contained such defects;

    b.     Plaintiff Mario Soares and Class Members have been deprived of making an informed decision about the Vehicles they have purchased or leased; and

    c.     Plaintiff Mario Soares and Class Members have incurred out-of-pocket expenses to repair defective AHR systems.

67.     Defendants' conduct was willful and knowing, and thus the damages recovered in this action should be multiplied as permissible and appropriate under Mass. G.L. 93A.

68.     In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

69.     Because Defendants' deceptive and unfair conduct is ongoing, injunctive relief is necessary and proper.

70.     On April 8, 2020, Plaintiffs sent to Defendant FCA by certified mail a written demand for relief as required by Mass. G.L. 93A § 9(3).   On June 17, 2020, Plaintiffs sent to Defendant Grammer by certified mail a written demand for relief as required by Mass. G.L. 93A § 9(3).  Defendant failed to provide an adequate remedy in response to Plaintiff's demand within 30 days from the date notice was received and still has not remedied its violations of Mass. G.L. 93A.  As such, the Class members are entitled to actual and punitive damages along with restitution and disgorgement of all earnings, profits, compensation and benefits obtained by Defendant as a result of its violations of Mass. G.L. 93A.

71.     Plaintiff also seeks an order enjoining the unlawful practices described herein and an Order requiring Defendant to notify the Class members of the defect associated with the Class Vehicles.

**Count II**
**Fraudulent Concealment**
**(On Behalf of Plaintiff Mario Soares and the Proposed Class,**
**Against All Defendants)**

72.     Plaintiff Mario Soares incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 71 above, inclusive, of this Complaint as if fully set forth herein.

73.     Defendants made false statements and omissions of material facts, including that:

a.      Misrepresenting that the Subject Vehicles were safe;

b.      Misrepresenting that the Subject Vehicles were free from defects;

c.      Misrepresenting that the AHR Systems installed in the Subject Vehicles were a safety benefit to drivers and passengers;

d.      Omitting that the AHR Systems were defective and that the defective headrests posed a safety risk to drivers, passengers, and the general public.

74.     Defendants made false statements and omissions of material facts to Plaintiff Mario Soares and the Members of the Classes at least when they purchased their Vehicles.

75.     Defendants knew or should have known that these statements were false and that the omissions were material.  Alternatively, Defendants recklessly made these false statements and/or omissions without having any reasonable basis to believe they were true.

76.     Defendants intended that its false statements and omissions of material facts would induce Plaintiff Mario Soares and each of the Members of the Class to purchase the Subject Vehicles.

77.     Plaintiff Mario Soares and the Members of the Class reasonably relied on the false statements and omissions of material facts regarding the Subject Vehicles as described above.

78.     Plaintiff Mario Soares and Members of the Class would not have purchased or would have paid less for a Subject Vehicle had it been accurately marketed, advertised, packaged, and/or sold.

79.     Defendants' false statements and omissions of material facts directly and proximately caused the damages suffered by Plaintiff Mario Soares and Members of the Class.

80.     As a result of Defendant's false statements and omissions of material facts, Plaintiff Mario Soares and each of the other Members of the Class have sustained damages in an amount to be proven at trial.

81.     In addition, Defendants' conduct showed malice, motive, and a reckless disregard of the truth such that an award of punitive damages is appropriate.

82.     Because Defendants' deceptive and unfair conduct is ongoing, injunctive relief is necessary and proper.

**Count III**
**Breach of Express Warranty under Mass. G. L. ch. 106, § 2A-212, *et seq.***
**(On Behalf of Plaintiff Mario Soares and the Proposed Class, Against FCA)**

83.    Plaintiff Mario Soares incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 64 above, inclusive, of this Complaint as if fully set forth herein.

84.    As set forth above, the written warranty provided to Plaintiff Mario Soares and the Class specifically provides that FCA will cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

85.    As described herein, the Class Vehicles were manufactured with defective material and such defect existed at the time the Vehicles left the manufacturing plant.  FCA failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the subject materials defect under the Vehicle's warranty as described herein.

86.    Defendant FCA's acts in failing and/or refusing to repair the materials defect during the warranty period so as to bring the Vehicles into conformity with the express warranties, deprived Plaintiff Mario Soares and Class Members of their rights guaranteed them under the express warranties offered by Chrysler.

87.    As a direct and proximate result of the willful failure of Chrysler to comply with its obligations under the express warranties, Plaintiff Mario Soares and Class Members have suffered actual and consequential damages.  Such damages include, but are not limited to, the cost of repairing the Vehicles, the loss of the use and enjoyment of the subject Vehicle, and a diminution in the value of the Vehicle containing the materials defects identified herein. The precise amount

of these damages is unknown at the present time but is in excess of the jurisdictional limits of this Court.

**Count IV**
**Breach of Implied Warranties Under Mass. G. L. ch. 106, § 2-313**
**(On Behalf of Plaintiff Mario Soares and the Proposed Class,**
**Against All Defendants)**

88.     Plaintiff Mario Soares incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 87 above, inclusive, of this Complaint as if fully set forth herein.

89.     Prior to the time that the Defendants' AHR system was used by Plaintiff Mario Soares, Defendants impliedly warranted that it was of merchantable quality and safe and fit for the use for which it was intended.

90.     The purchasers of the Subject Vehicles and their AHR systems were unskilled in the research, design and manufacture of the AHR system, and reasonably relied entirely on the skill, judgment and implied warranty of Defendants that the vehicle and its AHR system was safe for its intended use.

91.     However, the vehicle and AHR system installed therein, was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

92.     Defendants, by selling, delivering and/or distributing the defective vehicle and AHR system breached the implied warranty of merchantability and fitness and caused Plaintiff Mario Soares and Class Members to suffer severe pain and emotional distress, incur medical expenses and incur a loss of earning capacity.

93.     As a result of the aforementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

**Count V**
**Unjust Enrichment**
**(On Behalf of Plaintiff Mario Soares and the Proposed Class,**
**Against All Defendants)**

94.     Plaintiff Mario Soares incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 93 above, inclusive, of this Complaint as if fully set forth herein.

95.     Plaintiff Mario Soares and the Class Members conferred benefits on FCA by purchasing or leasing the Subject Vehicles.

96.     FCA received these benefits to the detriment of Plaintiff Mario Soares and the Class Members because Plaintiff Mario Soares and the Class Members purchased a deceptively advertised product that is not what they bargained for and that would unnecessarily jeopardize their own safety, and the safety of their passengers and the general public.

97.     FCA has been unjustly enriched in retaining the revenues derived from selling or leasing the Subject Vehicles to Plaintiff Mario Soares and Class Members. Retention of those monies under these circumstances is unjust and inequitable because FCA's representations about the Subject Vehicles were misleading to consumers, which caused injuries to Plaintiff Mario Soares and the Class Members, because they would have not purchased the Vehicles or would have paid less for the Vehicles if they had known the true facts.

98.     Because FCA's retention of the non-gratuitous benefits conferred on it by Plaintiff Mario Soares and the Class Members is unjust and inequitable, FCA must pay restitution to Plaintiffs and the Class Members for its unjust enrichment, as ordered by the Court.

**Count VI**
**Strict Products Liability**
**(On Behalf of Plaintiff Maria Costa, Against All Defendants)**

99.     Plaintiff Costa incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 62 above, inclusive, of this Complaint as if fully set forth herein.

100.     Defendants designed, manufactured, promoted, distributed, marketed, or sold the Subject Vehicles equipped with AHR systems.

101.     At all times material hereto, the AHR system in the 2015 Jeep Cherokee that Plaintiff Costa was driving was designed, manufactured, promoted, distributed, marketed, and sold by the Defendants; and was expected to reach—and did reach—consumers, including Plaintiff Costa, without substantial change in the condition in which it was sold.

102.     At all times material hereto, the AHR systems designed, manufactured, promoted, distributed, marketed, and sold by the Defendants was in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce.  Such condition included, but is not limited to, one or more of the following particulars:

    a.      When placed in the stream of commerce, the AHR System contained unreasonably dangerous design defects and was not reasonably safe for the intended use, subjecting Plaintiff and others to risks, including the risk that the AHR system would explode without the vehicle being involved in a collision and cause injury;

    b.      The AHR system was insufficiently tested; and/or

    c.      The AHR system was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff of the full nature or extent of the risks associated with its use.

103.     Defendants knew or should have known of the dangers associated with the use of their AHR System, as well as the defective nature of the system.  Despite this knowledge, Defendants continued to manufacture, sell, distribute, promote and supply the AHR Systems so as to maximize sales and profits at the expense of the public health and safety.  Defendants' conduct was malicious and done in conscious disregard of the foreseeable harm caused by the AHR System and in conscious disregard for the rights and safety of consumers such as Plaintiffs.

104.     Plaintiffs used the AHR System in the Jeep Cherokee as directed for its intended purpose.

105.    At all times herein mentioned, the AHR system in the vehicle used by Plaintiff Costa was defective, and Defendants knew that it was to be used by the user without inspection for defects therein.  Moreover, Plaintiffs did not know or have any reason to know at the time of the use of the AHR system, of the existence of the aforementioned defects.  At no time prior to the AHR's unexpected Deployment could Plaintiffs have discovered the defects in the AHR system through the reasonable exercise of care.

106.    At no time prior to Plaintiff Costa's injury, had the AHR system been materially altered or modified.

107.    As a direct and proximate result of the failure of the defective AHR system, Plaintiff Costa suffered the injuries and damages as described herein.

**Count VII**
**Negligence**
**(On Behalf of Plaintiff Maria Costa, Against All Defendants)**

108.    Plaintiff Costa incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 62 above, inclusive, of this Complaint as if fully set forth herein.

109.    At all times relevant hereto, Defendants designed, manufactured, distributed, sold, marketed, and promoted the AHR System for sale to consumers such as Plaintiffs.

110.    Defendants negligently and unreasonably designed, manufactured, distributed, sold, marketed, and promoted the AHR system.  In so doing, Defendants breached their duty of care to foreseeable consumers including Plaintiff Costa.

111.    As a direct, legal, proximate, and producing cause of Defendants' negligent design, testing, manufacturing, marketing, selling, and promoting the Plaintiff's vehicle, including its AHR system, Plaintiff Costa suffered injuries as set forth above.

112.     Defendants' negligent design, testing, manufacturing, selling, and promoting of the plaintiff's vehicle, including its AHR system, was a substantial factor in causing Plaintiff's injuries as set forth above.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Mario Soares, individually and on behalf of the other Members of the Class, and Plaintiff Maria Costa, individually, respectfully request that the Court enter judgment against Defendants, and each of them jointly and severally, as follows:

A.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff Mario Soares as the Class Representative of the Class, and appointing the undersigned counsel as Counsel for the Class;

B.     Declaring that Defendants' failure to disclose the dangers of the defective AHR Systems and misrepresentations to the contrary were unfair, deceptive, fraudulent, wrongful, and unlawful;

C.     Permanently enjoining Defendants from engaging in the unfair business practices complained of herein, and issuing an injunction requiring Defendant to issue corrective actions, including notification and repairs for the Class Vehicles;

D.     Ordering Defendants to pay to the Class damages in an amount to be proven at trial;

E.     Ordering Defendants to pay restitution as authorized by law;

F.     Ordering Defendants to pay for general damages for the personal injuries to Plaintiff Maria Costa, individually;

G. Ordering Defendants to pay for all past, current, and future medical and incidental expenses for Plaintiff Maria Costa, individually;

H. Ordering Defendants to pay for all loss of earnings, present and future, and loss of earning capacity for Plaintiff Maria Costa, individually;

I. Ordering Defendants to pay for punitive and/or exemplary damages in an amount sufficient to punish Defendants and deter similar conduct in the future, according to proof;

J. Ordering Defendants to pay an award of reasonable attorney's fees and costs, as provided by law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Class;

K. Ordering Defendants to pay such other interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

L. Ordering such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on issues so triable.

Dated: October 2, 2020

Respectfully submitted,

/s/ *Kimberly A. Dougherty*

_____

Kimberly A. Dougherty, Esquire
BBO# 658014
Andrus Wagstaff, PC
19 Belmont Street
South Easton, MA 02375
Telephone: (508) 230-2700
Email: kimdougherty@andruswagstaff.com

And

Mark P. Chalos (*pro hac vice forthcoming*)
Kenneth S. Byrd (*pro hac vice forthcoming*)
Madeline M. Gomez (*pro hac vice forthcoming*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone:  (415) 313-9000
Facsimile:  (415) 313-9965
mchalos@lchb.com
kbyrd@lchb.com
mgomez@lchb.com


William A. Kershaw (*pro hac vice forthcoming*)
Stuart C. Talley (*pro hac vice forthcoming*)
Ian J. Barlow (*pro hac vice forthcoming*)
KERSHAW, COOK & TALLEY PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 721-2501
bill@kctlegal.com
stalley@kctlegal.com
ian@kctlegal.com

*Attorneys for Plaintiff*