UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIA COSTA, *individually*, and MARIO SOARES, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> FCA US LLC f/k/a CHRYSLER GROUP LLC, and GRAMMER INDUSTRIES, INC., <br><br> Defendants. | \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \*      Civil Action No. 20-cv-11810-ADB |

## <u>MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS</u>

BURROUGHS, D.J.

Plaintiffs Maria Costa and Mario Soares (collectively, "Plaintiffs") allege that Grammer Industries, Inc. ("Grammer") manufactured defective headrests that were installed in vehicles sold or leased by FCA US LLC ("FCA," and, together with Grammer, "Defendants"). [ECF No. 1 ("Compl.")]. Ms. Costa, who alleges that she was injured by one of the defective headrests, brings individual negligence and strict products liability claims. [<u>Id.</u> ¶¶ 99–112]. Mr. Soares— seeking to represent a class of Massachusetts residents who own FCA cars with these headrests—asserts multiple claims for economic losses allegedly caused by Defendants' statements and actions concerning the headrests. [<u>Id.</u> ¶¶ 60–98]. Currently before the Court is Defendants' motion to dismiss. [ECF No. 26]. Defendants, both jointly and individually, identify various purported deficiencies with Mr. Soares' claims. <u>See</u> [ECF No. 27]. Additionally, Grammer maintains that the Court lacks personal jurisdiction over it. <u>See</u> [ECF

No. 28 at 5].  For the reasons set forth below, Defendants' motion, [ECF No. 26], is <u>GRANTED</u> in part and <u>DENIED</u> in part.

## I.        BACKGROUND

Most of the following facts are taken from the complaint, [Compl.], the factual allegations of which are assumed to be true when considering a motion to dismiss, <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014).  In assessing whether personal jurisdiction exists, the Court may also consider "whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts."  <u>Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.</u>, 825 F.3d 28, 34 (1st Cir. 2016).

### A.        Designing and Manufacturing the AHR Headrests

FCA, a Delaware limited liability company with its principal place of business in Michigan, makes and sells cars.  [Compl. ¶ 13].  FCA equips certain of its cars with Active Head Restraint ("AHR") headrests, which are designed to mitigate the risk of whiplash.[1]  [<u>Id.</u> ¶ 18]. Grammer, a South Carolina corporation with its principal place of business in Michigan, designs and manufactures the AHR headrests installed in the Subject Cars.  [<u>Id.</u> ¶¶ 14, 19].  Each AHR headrest consists of two padded sections connected by a spring-based mechanism.  [<u>Id.</u> ¶ 2]. When the AHR headrest's sensor detects a rear-impact, the two sections separate, and the front

---

[1] Those cars include: (1) the Dodge Journey (2010–18); (2) the Dodge Nitro (2010–11); (3) the Jeep Liberty (2010–12); (4) the Jeep Patriot (2010–17); (5) the Jeep Compass (2010–17); (6) the Dodge Caliber (2010–12); (7) the Dodge Caravan (2010–18); (8) the Chrysler Town & Country (2010–18); (9) the Dodge Durango (2011–18); (10) the Jeep Grand Cherokee (2011–18); (11) the Chrysler Sebring/Avenger (2010–14); and (12) the Chrysler 200 (2010–2014) (collectively, the "Subject Cars").  [Compl. ¶ 20].

section deploys forward, at roughly sixty-seven miles per hour, to catch the head of the driver or passenger.  [Id. ¶ 3].

Grammer designs, develops, and safety-tests the AHR headrests in Germany and Michigan.  [ECF No. 28-1 ¶ 7].[2]  GRAMMER Automotive Puebla, S.A. de C.V., a Grammer affiliate, manufactures the AHR headrests at a Mexican facility.  [Id. ¶ 9].  Grammer sells the AHR headrests to seat manufacturers located in Michigan, Mexico, and Canada (the "Seat-makers")—none of whom are parties to this litigation—who incorporate the headrests into seats, which are, in turn, installed in FCA cars that are eventually sold to consumers all over the country, including Massachusetts.  [Id. ¶ 10; Compl. ¶ 14].  Once Grammer sells the AHR headrests to the Seat-makers, it has no control over which cars they are incorporated into or where those cars are sold.  [ECF No. 28-1 ¶ 14].  Grammer has not distributed literature or materials about the AHR headrests in (or targeted towards) Massachusetts or established any communication channels with individuals in Massachusetts who own or lease FCA vehicles.  [Id. ¶¶ 17–18].  Nor does Grammer have offices, bank accounts, assets, directors, officers, employees, or property in Massachusetts.  [Id. ¶¶ 22–26].

---

[2] In support of its motion, Grammer filed a declaration from Rick Cassidy, a Vice President of Sales and Projects, Americas.  [ECF No. 28-1 ¶ 1].  While Plaintiffs contest the significance of the facts contained in the declaration, they do not seem to genuinely dispute their veracity, and the Court therefore accepts them as true for purposes of deciding the instant motion.  See Baskin-Robbins, 825 F.3d at 34.  Further, to the extent Plaintiffs' brief can be read as disputing the facts in the Cassidy declaration, see [ECF No. 36 at 9 ("Without discovery from Grammer, Plaintiffs (and the Court) do not have the ability to assess the accuracy or completeness of those statements.")], the Court finds that Plaintiffs' counsel's arguments are insufficient to create a genuine dispute, see Kuan Chen v. United States Sports Acad., Inc., 956 F.3d 45, 56 (1st Cir. 2020) ("But for this purpose, facts are not deemed disputed merely because defense counsel, in an unsworn brief or in argument before a court, challenges them.").

B.      **The AHR Headrests' Alleged Defects**

Because of an alleged defect in the mechanism connecting the two sections of the AHR headrests, some headrests unexpectedly deploy absent a rear-end collision.  [Compl. ¶ 4].  In these instances, materials used in the mechanism interact negatively, leading to deterioration, and, at a certain point, the mechanism can no longer withstand the pressure of the spring-loaded headrest.  [Id. ¶¶ 4–5].  When the pressure becomes too great, the AHR headrest deploys, typically crashing into the head and/or neck of the driver or passenger and making a loud noise, which can startle and distract a driver.  [Id. ¶ 6].  Between 2015 and 2018, consumers lodged approximately ninety-four complaints with the National Highway Traffic Safety Administration ("NHTSA") concerning AHR headrest malfunctions in the Subject Cars.[3]  [Id. ¶ 26].  In many of these complaints, the complainant indicates that he or she informed FCA of the issue, but FCA refused to pay for repairs or otherwise remedy the problem.  [Id.].

Plaintiffs maintain that both FCA and Grammer were aware of the defective AHR headrests "by or before 2010," "were further notified of the defect by numerous consumer complaints, its own repair database, warranty claims, and the NHTSA complaints," and "received notice of thousands of reported failures prior to the date [Ms. Costa] suffered her injuries," but nevertheless failed to disclose the defect to the public.  [Compl. ¶ 31].  To the contrary, Defendants told customers that issues with the AHR headrests were caused by the customers' failure to properly maintain their cars and/or by tampering.  [Id. ¶ 33].  As of the date the complaint was filed, Defendants had not recalled the Subject Cars, offered customers a free repair, modification, or replacement, or reimbursed customers who incurred AHR

---

[3] Plaintiffs' complaint includes a number of these NHTSA complaints as examples.  See [Compl. ¶ 26].  The cited NHTSA complaints span from June 8, 2015 to January 27, 2018.  [Id.].

headrest-related costs or damage, [id. ¶ 35], even though FCA's "Basic Warranty" covers "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation," [id. ¶ 28].

### C.    Plaintiffs' Experience with the AHR Headrests

Mr. Soares and Ms. Costa are a married couple living in Fall River, Massachusetts. [Compl. ¶¶ 1, 11–12].  In April 2015, Mr. Soares purchased a new 2015 Jeep Grand Cherokee (the "Car") from a Chrysler dealership in Somerset, Massachusetts.  [Id. ¶ 36].  Mr. Soares decided to purchase a Grand Cherokee, instead of another car, in part because of his understanding that Jeeps are among the safest sport utility vehicles available.  [Id. ¶ 37].  He formed this understanding based, in part, on FCA's "assurances that the [Car] was safe, along with FCA's advertisements and the materials available on FCA's website concerning the [Car]'s safety features."[4]  [Id.].  If the Car were less safe than advertised, he would not have purchased it (or would have paid less than he did).  [Id. ¶ 38].

Mr. Soares shares the Car with Ms. Costa, who occasionally drives it.  [Compl. ¶ 39].  On or about February 17, 2020, Ms. Costa was driving the Car when the AHR headrest unexpectedly deployed, even though there had been no collision or rear-end impact.  [Id. ¶ 41].  The headrest made a loud noise and struck Ms. Costa in the back of the head, which startled her and distracted her from the road.  [Id.].  Because of the incident, Ms. Costa has suffered chronic migraines and persistent neck pain.  [Id. ¶ 42].

---

[4] In promotional materials and advertisements, FCA emphasizes the safety of its cars.  [Compl. ¶ 21].  For instance, in its Jeep brochures, FCA notes that Jeeps have "over 70 available safety and security features" and that "beneath the surface of the Jeep Grand Cherokee lies a work of safety . . . systems that give you confidence behind the wheel and help protect you and your passengers."  [Id.].  FCA makes similar broad claims regarding safety in connection with other models.  [Id.].

Plaintiffs researched whether Defendants would cover the cost of replacing the AHR headrests.  [Compl. ¶ 40].  Their research revealed that Defendants have a policy of not covering replacement costs.  [Id.].  Plaintiffs also learned that replacing the headrests would cost more than $1,400.  [Id.].  Because Mr. Soares could not afford to replace the headrests, he still drives the Car with a deployed headrest on one side and a purportedly defective, non-deployed headrest on the other.  [Id.].

### D.   Procedural Background

On October 2, 2020, Plaintiffs filed their seven-count complaint.  [Compl.].  Ms. Costa brings a common law negligence claim and a strict products liability claim against Defendants for her personal injuries (Counts VI and VII).  [Id. ¶¶ 99–112].  Mr. Soares, seeking  to represent a class consisting of "[a]ll persons in Massachusetts who currently own or lease, or who have owned or leased, any of the Subject Vehicles manufactured by FCA or any of its subsidiaries or affiliates that is equipped with an ARH system," [id. ¶ 48],[5] asserts the following five claims: (1) a violation of Massachusetts General Laws Chapter 93A (Count I), [id. ¶¶ 60–71]; (2) fraud (Count II), [id. ¶¶ 72–82]; (3) breach of express warranty (Count III), [id. ¶¶ 83–87]; (4) breach of implied warranty (Count IV), [id. ¶¶ 88–93]; and (5) unjust enrichment (Count V), [id. ¶¶ 94–98].[6]  Although he advances multiple legal theories, Mr. Soares' basic contention is that because Defendants knew about the defective AHR headrests but did not warn the public, they should be held liable for economic damages caused by this deception, including the premium

---

[5] Excluded from the putative class are "Defendants; Defendants' employees, affiliates, officers, and directors, including franchised dealers; any claims for physical injuries related to the defect at issue in this litigation; and the judicial officer(s) to whom this case is assigned, and the judicial officer(s)' immediate family and legal staff."  [Compl. ¶ 49].

[6] Each of Mr. Soares' claims is asserted against both FCA and Grammer except Count III, which is asserted only against FCA.  See [Compl. ¶ 83].

that Mr. Soares and others paid for "safe" cars, out-of-pocket costs for repairing the AHR

headrests, and any other resultant damages.[7]

On December 7, 2020, Defendants moved to dismiss.  [ECF No. 26].  The parties filed

briefs, oppositions, and replies, see [ECF No. 27 (Defendants' joint brief); ECF No. 28

(Grammer's brief); ECF No. 29 (FCA's brief); ECF No. 35 (Plaintiffs' joint opposition); ECF

No. 36 (Plaintiffs' Grammer-specific opposition); ECF No. 37 (Plaintiffs' FCA-specific

opposition); ECF No. 38 (Defendants' joint reply); ECF No. 39 (FCA's reply); ECF No. 40

(Grammer's reply)], and the motion is ripe for resolution.

## II.        Grammer's Motion to Dismiss for Lack of Personal Jurisdiction

Grammer moves to dismiss the complaint in its entirety based on a lack of personal

jurisdiction.[8]  [ECF No. 26 at 1 n.1; ECF No. 28 at 6–12].  Plaintiffs maintain that the Court has

personal jurisdiction over Grammer.  [ECF No. 36 at 6–12].  For the reasons stated below, the

Court lacks personal jurisdiction over Grammer, and Grammer's motion to dismiss, [ECF No.

26], is therefore GRANTED.

### A.        Legal Standard

Personal jurisdiction refers to a court's "power to require the parties to obey its [orders]."

Hannon v. Beard, 524 F.3d 275, 279 (1st Cir. 2008) (quoting Daynard v. Ness, Motley, Loadholt,

Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002)).  By choosing this forum, Plaintiffs

have consented to the personal jurisdiction of the Court.  See Driscoll v. McCann, No. 19-cv-

---

[7] With respect to the safe car premium, Mr. Soares' argument is that he paid X dollars for the Car based on the understanding that it was safe, and would have paid a lesser sum, Y, had he been aware of the defective AHR headrests.  Accordingly, he seeks to recover the difference between X and Y.

[8] Grammer also moves to dismiss on other grounds.  Because the Court finds that it lacks personal jurisdiction over Grammer, it does not address those other grounds.

12302, 2020 WL 7024656, at *2 (D. Mass. Nov. 30, 2020).  As to Grammer, however, the Due

Process Clause "protects an individual's liberty interest in not being subject to the binding

judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471−72 (1985) (quoting Int'l Shoe Co. v.

Washington, 326 U.S. 310, 319 (1945)).  Therefore, the Court may not assert jurisdiction over

Grammer unless its "conduct and connection with [Massachusetts] are such that [it] should

reasonably anticipate being haled into court []here."  World-Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, 297 (1980).

Plaintiffs bear the burden of establishing the Court's personal jurisdiction over Grammer.

Daynard, 290 F.3d at 50.  Under the "prima facie" standard, "the inquiry is whether [Plaintiffs]

ha[ve] proffered evidence which, if credited, is sufficient to support findings of all facts essential

to personal jurisdiction."  Bluetarp Fin., Inc. v. Matrix Constr. Co., 709 F.3d 72, 79 (1st Cir.

2013) (quoting Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)).  Plaintiffs may not,

however, establish the Court's personal jurisdiction over Grammer with "unsupported allegations

in their pleadings," and are instead "obliged to adduce evidence of specific facts."  Platten v.

H.G. Berm. Exempted Ltd., 437 F.3d 118, 134 (1st Cir. 2006) (first quoting Boit v. Gar-Tec

Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992); then quoting Foster-Miller, Inc. v. Babcock &

Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)).  The Court may also "add to the mix facts put

forward by [Grammer], to the extent that they are uncontradicted."  Daynard, 290 F.3d at 51

(quoting Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)).

B.      **Discussion**

Courts may exercise two types of personal jurisdiction under the Fourteenth Amendment: general and specific.[9]  "[G]eneral jurisdiction requires affiliations 'so "continuous and systematic" as to render [a person] essentially at home in the forum State.'"  Daimler AG v. Bauman, 571 U.S. 117, 133 n.11 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)).  Although the "paradigmatic examples of locales in which a defendant corporation is considered at home are its state of incorporation and the state that houses its principal place of business," in some cases "a defendant corporation's general business operations in a state in which it is neither incorporated nor headquartered 'may be so substantial and of such a nature as to render the corporation at home in that State.'"  Kuan Chen v. United States Sports Acad., Inc., 956 F.3d 45, 57 (1st Cir. 2020) (quoting Daimler, 571 U.S. at 139 n.19).  Here, it is undisputed that Grammer is organized under the laws of South Carolina and has its principal place of business in Michigan.  See [Compl. ¶ 14; ECF No. 28-1 ¶ 5].  Further, Plaintiffs do not seem to argue—and their factual allegations are plainly insufficient to demonstrate—that Grammer is subject to general jurisdiction in Massachusetts based on its business operations here.  Contra Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 447–48 (1952) (finding that a company was subject to general jurisdiction in Ohio where the company had ceased operating in the Philippines because of World War II and the president of the

---

[9] In addition to satisfying Due Process concerns, "[t]o establish personal jurisdiction in a diversity case, a plaintiff must satisfy . . . the forum state's long-arm statute . . . ." C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014) (citing Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994)).  Here, because Grammer makes no arguments regarding the Massachusetts long-arm statute, see [ECF Nos. 28, 40], the Court proceeds directly to the constitutional analysis, see Kuan Chen, Inc., 956 F.3d at 54 (focusing "inquiry exclusively on the federal constitutional analysis" where neither party made arguments specific to the Massachusetts long-arm statute).

company relocated to Ohio and conducted business from an office there); see Daimler, 571 U.S. at 129 (describing Perkins as the "textbook case of general jurisdiction"). Thus, Plaintiffs' only remaining jurisdictional hook is specific personal jurisdiction.

"Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001) (quoting Mass. Sch. of L., 142 F.3d at 34). For the Court to exercise specific personal jurisdiction over Grammer consistent with the Due Process Clause, each of three conditions must be satisfied:

> First, the claim underlying the litigation must directly arise out of, or relate to, [Grammer]'s forum-state activities. Second, [Grammer]'s in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making [Grammer]'s involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must . . . be reasonable.

Daynard, 290 F.3d at 60 (quoting Foster-Miller, 46 F.3d at 144). The inquiry "is 'not susceptible [to] mechanical application,'" PREP Tours, Inc. v. Am. Youth Soccer Org., 913 F.3d 11, 17 (1st Cir. 2019) (quoting Kulko v. Superior Ct. of Cal., 436 U.S. 84, 92 (1978)), rather, "[e]ach case requires an individualized weighing of the material facts," United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992) (quoting Burger King Corp., 471 U.S. at 485–86). For the reasons detailed below, the Court finds that Grammer has not purposefully availed itself of the privilege of conducting activities in Massachusetts and therefore is not subject to the Court's personal jurisdiction.[10]

---

[10] Based on this finding, the Court will not discuss the other two prongs of the constitutional specific jurisdiction inquiry.

1.      Purposeful Availment

The Court may exercise personal jurisdiction over Grammer only if its conduct "represent[s] a purposeful availment of the privilege of conducting activities in [Massachusetts]." Sigros v. Walt Disney World Co., 129 F. Supp. 2d 56, 66 (D. Mass. 2001) (quoting United Elec., 960 F.2d at 1089).  For Grammer to have purposefully availed itself of the privilege of conducting activities in Massachusetts, its contacts with Massachusetts must be voluntary, so that "jurisdiction is not premised on 'random, isolated, or fortuitous' contacts with the forum state," Katz v. Spiniello Cos., 244 F. Supp. 3d 237, 245 (D. Mass. 2017) (internal citation omitted), and foreseeable, such that it should "reasonably anticipate being haled into court" in Massachusetts, Phillips, 530 F.3d at 28 (quoting Adelson v. Hananel, 510 F.3d 43, 50 (1st Cir. 2007)). "Voluntariness requires that the defendant's contacts with the forum state 'proximately result from actions by the defendant [itself].'"  Id. (quoting Burger King Corp., 471 U.S. at 475). Those contacts "must be deliberate, and 'not based on the unilateral actions of another party.'" Id. (quoting Adelson, 510 F.3d at 50).

Plaintiffs advance a stream of commerce theory, essentially arguing that Grammer should be subject to personal jurisdiction here because it "knew, expected, and intended that its headrests would end up in [Massachusetts]."  [ECF No. 36 at 5, 8].

The Supreme Court considered the interplay of stream of commerce and purposeful availment in Asahi Metal Industry Co. v. Superior Court of California, Solano County.  480 U.S. 102 (1987).  In a plurality opinion, Justice O'Connor held that a defendant's placement of a product into the stream of commerce with the awareness that it may eventually end up in a forum state, without more, is insufficient to show purposeful availment.  Id. at 112.  Justice O'Connor's requirement of "more" has been described as the "stream of commerce plus" standard which

requires that a plaintiff allege "additional conduct of the defendant . . . indicat[ing] an intent or purpose to serve the market in the forum State," beyond simply placing a product in the stream of commerce, to satisfy the purposeful availment requirement based on a stream of commerce theory.  Newman v. European Aeronautic Defence & Space Co. EADS N.V., No. 09-cv-10138, 2011 WL 2413792, at *5 (D. Mass. June 16, 2011) (alteration in original) (quoting Asahi, 480 U.S. at 112); see Micheli v. Techtronic Indus., Co, No. 11-cv-10503, 2012 WL 6087383, at *9–10 (D. Mass. Mar. 1, 2013).  In Asahi, Justice O'Connor provided examples of additional conduct, or plus factors, that could tip the scales in favor of jurisdiction, such as "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."  480 U.S. at 112 (plurality opinion).

Here, Plaintiffs allege no facts suggesting the presence of any "plus factors" in support of their stream of commerce argument.  They do not, for example, allege that Grammer designed the AHR headrests with Massachusetts consumers in mind, advertised the headrests in Massachusetts, established any communication channels with Massachusetts consumers, or sold the headrests to the Seat-makers with the specific intent that the headrests be used in seats intended for cars to be purchased by Massachusetts consumers.  See Asahi, 480 U.S. at 112 (plurality opinion).  Plaintiffs seem to rely on that fact that Grammer sells millions of AHR headrests and is aware that some (unknown) portion of them end up in cars sold in Massachusetts.  [ECF No. 36 at 9–10].  This fact alone, however, is insufficient.  As noted above, Grammer has no further involvement in the distribution chain once it sells the headrests to the Seat-makers.  See [ECF No. 28-1 ¶ 14].  Because purposeful availment cannot be established

"based on the unilateral actions of" others, Phillips, 530 F.3d at 28 (quoting Adelson, 510 F.3d at 50), the Court cannot exercise personal jurisdiction over *Grammer* merely because *FCA* purposefully sells cars, with Grammer's headrests in them, in Massachusetts.

Courts in this circuit have consistently (and recently) held that plaintiffs cannot establish purposeful availment under a stream of commerce theory when they do not allege sufficient plus factors.  See, e.g., Boit, 967 F.2d at 683 ("'[M]ere awareness' that a product may end up in the forum state does not constitute 'purposeful availment.'"); Pajak v. Rohm & Haas Co., 387 F. Supp. 3d 138, 144 (D. Mass. 2019) (rejecting a bare "channels of commerce" argument for purposeful availment where plaintiff did not present any facts to "to support that [defendant] meaningfully and purposefully directed the allegedly defective [products] into Massachusetts (for example by designing [them] for or selling, advertising or marketing them to customers in Massachusetts)"); Estate of Rosario v. Falken Tire Corp., 109 F. Supp. 3d 485, 496 (D.P.R. 2015) (finding that personal jurisdiction over the defendant, a tire manufacturer, was lacking where plaintiff showed only a distribution chain in which the manufacturer sold the defective tire to a national distributor who, in turn, sold it to a store in Puerto Rico, where the plaintiff purchased it).[11]

---

[11] The cases that Plaintiffs rely on in support of jurisdiction are unconvincing and/or distinguishable.  In Kuan Chen, the First Circuit affirmed the district court's finding that there was no specific personal jurisdiction, 956 F.3d at 62, and therefore this case lends little support to Plaintiffs.  In Knox v. MetalForming, Inc., the First Circuit found that there was personal jurisdiction where, among other things, the defendant had "individually approved and manufactured according to purchaser-provided specifications each of the nearly fifty machines it sent to Massachusetts purchasers," required its distributor to "include, with each machine, materials that instructed that purchaser to contact [the defendant] directly, whether to purchase replacement parts or to obtain assistance with troubleshooting and fixing problems," and had serviced its Massachusetts customers via "spare parts sales."  914 F.3d 685, 693 (1st Cir. 2019); see also id. at 692 ("To be clear, we do not hold that the mere volume of [defendant]'s sales in Massachusetts over sixteen years standing alone would suffice . . . .").  Because Grammer is not

Accordingly, because Grammer has not purposefully availed itself of the privilege of conducting activities in Massachusetts, the Court cannot constitutionally exercise personal jurisdiction over it.  See Daynard, 290 F.3d at 60 (noting that to establish specific personal jurisdiction, a plaintiff must adequately demonstrate purposeful availment).

2.    Jurisdictional Discovery

Plaintiffs request jurisdictional discovery if the Court makes an adverse finding on personal jurisdiction.  [ECF No. 36 at 12].  Specifically, Plaintiffs would seek and "expect to obtain evidence about Grammer and its agent's and affiliate's contacts with Massachusetts, its understanding that it was dealing with Massachusetts commerce, the volume of Grammer's sales in Massachusetts, its distribution network, and other contacts it has with the forum state."  [Id. at 12 n.6].  Grammer maintains that jurisdictional discovery is unwarranted because Plaintiffs have failed to "make a colorable initial claim to jurisdiction."  [ECF No. 40 at 7].  The Court agrees with Grammer.

The First Circuit has "long held that 'a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of *in personam* jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense.'"  Swiss Am. Bank, 274 F.3d at 625 (quoting Sunview Condo. Ass'n v.

---

"a manufacturer which can direct where its products go . . . and which initiated an ongoing relationship with its in-forum purchasers," id. at 693, Knox is inapposite.  Finally, Plixer International, Inc. v. Scrutinizer GmbH, is too factually distinguishable to be persuasive.  905 F.3d 1 (1st Cir. 2018).  In assessing purposeful availment, the First Circuit noted that the case was "not a prototypical stream-of-commerce case" because the defendant, a provider of web-based services, could control where its services went.  Id. at 8; see also id. ("Cases including a standard stream-of-commerce analysis usually involve entities who cannot necessarily predict or control where downstream their products will land; intervening actors like distributors may take the products to unforeseeable markets.  But no intervening actor can bring [the defendant]'s product somewhere unexpected.").  Here, Grammer does not interact directly with end-users or dictate where its headrests go after leaving its possession.

Flexel Int'l, Ltd., 116 F.3d 962, 964 (1st Cir. 1997)).  "However, that entitlement is not absolute.

. . .  [E]ven when the plaintiff has been diligent and has made a colorable claim for personal

jurisdiction, the district court still has broad discretion to decide whether discovery is required."

Id. at 625–26 (citations and internal quotation marks omitted).  Further, "[i]n addition to making

a colorable claim, it is also incumbent upon the plaintiff to 'present facts to the court which show

why jurisdiction would be found if discovery were permitted.'"  Rain ex rel. Crandall v. Conn.

Gen. Corp., No. 17-cv-30115, 2019 WL 7604856, at *7 (D. Mass. Aug. 6, 2019) (quoting

Negron-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 27 (1st Cir. 2007)).

Here, Plaintiffs have not made "a colorable case for the existence of *in personam*

jurisdiction," and the Court declines to exercise its discretion to grant jurisdictional discovery.

Swiss Am. Bank, 274 F.3d at 625 (citations and internal quotation marks omitted).  Given the

uncontested facts in the record, discovery is unlikely to result in a finding that this Court has

personal jurisdiction over Grammer.  Mr. Cassidy has already attested to the absence of the "plus

factors" identified in Asahi.  Compare Asahi, 480 U.S. at 112 (plurality opinion) (listing, as

examples, "designing the product for the market in the forum State, advertising in the forum

State, establishing channels for providing regular advice to customers in the forum State, or

marketing the product through a distributor who has agreed to serve as the sales agent in the

forum State"), with [ECF No. 28-1 ¶ 8 ("Grammer designed and developed the FCA AHR

System for incorporation into vehicles marketed throughout the United States and the world, and

not specifically for the automotive market of the Commonwealth of Massachusetts.")], [id. ¶ 17

("Grammer does not now, nor has it ever, distributed any literature or materials about the FCA

AHR System specifically in or targeted to the Commonwealth of Massachusetts.")], [id. ¶ 18

("With respect to the FCA AHR System, Grammer has never established any channels for

providing regular advice to vehicle buyers and/or end-users of the FCA AHR System within the Commonwealth of Massachusetts")], and [id. ¶ 19 ("With respect to the FCA AHR System, Grammer has never entered into any contracts, service agreements, purchase orders or other agreements for the purpose of directly selling, promoting, advertising or providing of the FCA AHR System in or into the Commonwealth of Massachusetts.")].  Additionally, given Mr. Cassidy's sworn statements concerning Grammer's lack of other contacts with Massachusetts, see [id. ¶¶ 21–30], it is unlikely that discovery concerning Grammer's "contacts with Massachusetts," [ECF No. 36 at 12 n.6], will result in a finding of jurisdiction.  Finally, for the reasons noted above, "the volume of Grammer's sales in Massachusetts," [id.], is immaterial to the purposeful availment calculus here because Grammer has no control over where the cars with its headrests are ultimately sold.

Thus, Plaintiffs' request for jurisdictional discovery is DENIED.

## III.     FCA's Motion to Dismiss for Failure to State a Claim

FCA moves to dismiss Counts I through VI of the complaint.  [ECF No. 26 at 1]. Plaintiffs oppose the motion as to Counts I through V but concede that Count VI should be dismissed.  See [ECF No. 35 at 9 n.8].  Accordingly, FCA's motion to dismiss Count VI, [ECF No. 26], is GRANTED, and the Court considers the other five claims below.

### A.     Legal Standard

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 76, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555 (2007).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

Because some of Mr. Soares' claims sound in fraud, Federal Rule of Civil Procedure 9(b)'s special pleading requirements apply to those claims.  Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  In the First Circuit, plaintiffs are required to set out "the who, what, where, and when of the allegedly false or fraudulent representation," Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004), and "identify[] the basis for inferring

scienter," <u>Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.</u>, 419 F. Supp. 3d 176, 189

(D. Mass. 2019) (quoting <u>N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale</u>, 567 F.3d

8, 13 (1st Cir. 2009)).  "[T]he specificity requirement extends only to the particulars of the

allegedly misleading statement itself.  The other elements of fraud, such as intent and

knowledge, may be averred in general terms." <u>Rodi v. S. New Eng. Sch. of L.</u>, 389 F.3d 5, 15

(1st Cir. 2004) (citations omitted); <u>see also</u> <u>Runyon v. Wellington Mgmt. Co., LLP</u>, No. 13-cv-

11236, 2015 WL 1276825, at *5 (D. Mass. Mar. 20, 2015) (noting that "reliance" is not subject

to Rule 9(b)'s heightened pleading requirement).

> Affirmative defenses, such as the statute of limitations, may be raised in a motion
> to dismiss under Federal Rule of Civil Procedure 12(b)(6), provided that the facts
> establishing the defense [are] clear on the face of the plaintiff's pleadings.  Where
> the dates included in the complaint show that the limitations period has been
> exceeded and the complaint fails to sketch a factual predicate that would warrant
> the application of either a different statute of limitations period or equitable
> estoppel, dismissal is appropriate.

<u>Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.</u>, 524 F.3d 315, 320 (1st Cir. 2008) (alteration in

original) (citations and internal quotation marks omitted).

**B.    Discussion**

1.    <u>Count I: Chapter 93A</u>

In Count I, Mr. Soares alleges that by selling him a car with defective headrests, FCA

engaged in an unfair and/or deceptive trade practice and therefore violated Massachusetts

General Laws Chapter 93A.  [Compl. ¶¶ 60–71].  FCA argues (1) that Mr. Soares failed to send

an adequate Chapter 93A demand letter before initiating this action; (2) that <u>Iannacchino v. Ford</u>

<u>Motor Co.</u>, 888 N.E.2d 879 (Mass. 2008), a 2008 case decided by the Massachusetts Supreme

Judicial Court ("SJC"), precludes Mr. Soares' claim; and (3) that Mr. Soares' allegations are

insufficient under the heightened pleadings standards for fraud claims.  <u>See</u> [ECF No. 27 at

10–14].  Mr. Soares responds that his demand letter was sufficient, Iannacchino does not bar his

claim, and his allegations are enough to survive a motion to dismiss.  [ECF No. 35 at 13–21].

Under Chapter 93A, § 9(3), at least thirty days before bringing a Chapter 93A claim, a

plaintiff must send the prospective defendant a letter "identifying the claimant and reasonably

describing the unfair or deceptive act or practice relied upon and the injury suffered."  Mass.

Gen. Laws ch. 93A, § 9(3).  Here, Plaintiffs sent FCA a demand letter more than thirty days

before filing suit, see [ECF No. 27-1 at 2–6 (demand letter dated April 6, 2020)], but the parties

dispute whether the letter is sufficient.  The purpose of the demand letter requirement is to "put[]

the defendant on notice of the plaintiff's claim, thereby encouraging negotiation and settlement."

Young v. Wells Fargo Bank, N.A., 828 F.3d 26, 33 (1st Cir. 2016).  Although not a model of

clarity, Plaintiffs' letter captures the thrust of Mr. Soares' claim and therefore provided adequate

notice to FCA.  Specifically, the letter (1) accuses FCA of knowing about the allegedly defective

headrests but failing to make necessary public disclosures, [ECF No. 27-1 at 4–5], (2) previews

the possibility of a class action litigation, [id. at 2, 5–6], and (3) identifies a damages theory, [id.

at 5].  Accordingly, the Court finds that Plaintiffs satisfied Chapter 93A's demand letter

requirement.  Cf. Casavant v. Norwegian Cruise Line Ltd., 952 N.E.2d 908, 913 (Mass. 2011)

("The demand letter required under G.L. c. 93A does not require claimants to set forth every

specific statutory or regulatory violation alleged, so long as it fairly notifies the prospective

respondent of the actions or practices of the respondent and the injury suffered by those

actions.").

With respect to Iannacchino, the Court finds that it does not bar Mr. Soares' claim.  In

that case, the plaintiffs, seeking to represent a putative class of Massachusetts residents owning

certain Ford cars and claiming that the door handles on their cars were unsafe, defective, and did

not comply with applicable federal safety standards, brought a Chapter 93A claim and a breach of implied warranty claim on that basis.  888 N.E.2d at 882.  The plaintiffs did not allege that their door handles had actually malfunctioned, that they were physically harmed, or that their cars were damaged.  Id.  Rather, they maintained that Ford's purported practice of knowingly building, selling, and refusing to recall cars that were unsafe, defective, and non-compliant was an unfair and/or deceptive practice that caused economic injury.  Id.  Although the SJC concluded that "the lack of accident-related injury or manifested defect" did not bar recovery under Chapter 93A as a matter of law, it ultimately held that the plaintiffs had failed to state a claim and remanded the case so that the trial court could dismiss the complaint without prejudice.  Id.  As to injury, the SJC reasoned as follows:

> If Ford knowingly sold noncompliant (and therefore potentially unsafe) vehicles or if Ford, after learning of noncompliance, failed to initiate a recall and to pay for the condition to be remedied, the plaintiffs would have paid for more (viz., safety regulation-compliant vehicles) than they received. Such an overpayment would represent an economic loss—measurable by the cost to bring the vehicles into compliance—for which the plaintiffs could seek redress under G.L. c. 93A, § 9.

Id. at 886–87 (citations omitted).  Nonetheless, because the plaintiffs failed to adequately allege that their cars did not comply with federal safety regulations, the SJC found that the plaintiffs had failed to state a viable Chapter 93A claim.  Id. at 887.  On this point, the SJC added that "[b]ecause the term 'defect' is conclusory and can be subjective as well, a bare assertion that a defendant, while representing the opposite, has knowingly manufactured and sold a product that is 'defective,' or suffers from 'safety-related defects,' does not suffice to state a viable claim." Id. at 888.  In short, "[w]here . . . there is no allegation that the plaintiffs—or indeed anyone else—have suffered personal injury or property damage, the complaint must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not."  Id.

20

Because Mr. Soares' headrest has actually malfunctioned, [Compl. ¶ 39], as distinguished

from Iannacchino, he is not required to identify a legally required standard that FCA allegedly

failed to meet.[12]   Contra Iannacchino, 888 N.E.2d at 888 (noting that "where . . . there is no

allegation that the plaintiffs . . . have suffered personal injury or property damage, the complaint

must identify a legally required standard . . .").  Further, whereas the plaintiffs in Iannacchino

sought damages solely for the amount they overpaid for their purportedly defective cars,

Mr. Soares also seeks to recover for property damage to the Car.  See [Compl. ¶ 66c]; see also

Costa v. Nissan N. Am., Inc.,  No. 18-cv-11523, 2019 WL 267463, at *1–2 (D. Mass. Jan. 18,

2019) (denying motion to dismiss and distinguishing Iannacchino because plaintiff "has not

simply identified a theoretical injury which she speculates could arise due to an unspecified

'defect,' like the plaintiffs in Iannacchino" but rather had "allege[d] that she personally

experienced recurrent safety-related performance problems, actual property damage, and real

economic harm").  Because Mr. Soares alleges that his car has already been damaged and points

out a very specific defect, Iannacchino is not an impediment to Mr. Soares' Chapter 93A claim.[13]

As to FCA's third argument, the Court finds that Mr. Soares' allegations are sufficient to

withstand a motion to dismiss.

> Chapter 93A proscribes all unfair methods of competition and unfair or deceptive
> acts or practices [made] in the conduct of any trade or commerce.  A practice or act
> is unfair under Chapter 93A if it is (1) within the penumbra of a common law,
> statutory, or other established concept of unfairness; (2) immoral, unethical,
> oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other
> business people. . . .  [T]he definition of an actionable unfair or deceptive act or

---

[12] Mr. Soares does describe, with great specificity, why and how the AHR headrest is defective.
See [Compl. ¶¶ 2–5].

[13] FCA argues that Iannacchino also bars Mr. Soares' implied warranty, express warranty, fraud
claims, and unjust enrichment claims.  [ECF No. 27 at 10–12].  This argument fails for the same
reasons.  Mr. Soares, unlike the plaintiffs in Iannacchino, is not merely asserting a speculative
injury based on an unmanifested defect.

> practice goes far beyond the scope of the common law action for fraud and deceit. That is particularly true here, given that Massachusetts case law suggests that one difference between a fraud claim and the more liberal 93A is allowance of a cause of action even in the absence of a duty to disclose.

CardiAQ Valve Techs., Inc. v. Neovasc Inc., No. 14-cv-12405, 2016 WL 1642573, at *5 (D. Mass. Apr. 25, 2016) (alterations in original) (citations and internal quotation marks omitted). Here, Mr. Soares alleges that FCA has sold or leased millions of cars with defective AHR headrests (including the Car), [Compl. ¶ 1], that FCA advertises its vehicles as safe, albeit in a general manner, [id. ¶ 21], that at least ninety-four individuals have lodged complaints with the NHTSA about faulty headrests in FCA's cars (and many of those individuals also alerted FCA), [id. ¶ 26], and that FCA has not issued a recall, reimbursed owners and lessees for repair costs, or otherwise offered to repair or replace the headrests, [id. ¶ 35]. Taken together, these allegations plausibly suggest that FCA violated Chapter 93A. See Twombly, 550 U.S. at 555 (noting that plausibility is the touchstone for evaluating allegations in light of a motion to dismiss); Morrison v. Toys "R" Us, Inc., 806 N.E.2d 388, 392 (Mass. 2004) (noting that a practice violates Chapter 93A if it is unscrupulous).

Thus, FCA's motion to dismiss Count I, [ECF No. 26], is DENIED.

### 2.   Count II: Fraud

In Count II, Mr. Soares alleges fraud. [Compl. ¶¶ 72–82]. Read liberally, Mr. Soares' allegations suggest two separate fraud-based theories: active misrepresentation and fraud by omission. [Id.]. FCA argues that Mr. Soares' allegations do not meet Rule 9(b)'s heightened pleading standard and that his fraud-by-omission claim fails for multiple other reasons as well. [ECF No. 27 at 15–24]. Mr. Soares counters that his allegations of fraud are sufficient to withstand a motion to dismiss. [ECF No. 35 at 17–21]. For the reasons below, the Court finds that neither fraud theory is viable.

To the extent Mr. Soares advances a misrepresentation-based fraud claim, his allegations are plainly deficient.  As noted above, fraud plaintiffs must set out "the who, what, where, and when of the allegedly false or fraudulent representation."  Alt. Sys. Concepts, 374 F.3d at 29. Further, general statements about big-picture concepts such as trust, security, reputation, and safety are non-actionable puffery.  See Toussaint v. Care.com Inc., 490 F. Supp. 3d 341, 350 (D. Mass. 2020) ("These statements (and even the graphics that accompanied the statements) were generalized statements regarding trust, security and reputation that are generally not actionable."); Beck v. FCA US LLC, 273 F. Supp. 3d 735, 750 (E.D. Mich. 2017) ("The Court concludes that, to the extent [plaintiff] is claiming that he relied on any [defendant]'s representations regarding their vehicles' general safety, quality, reliability, or performance, those assertions undoubtedly constitute non-actionable puffery.").  Here, Mr. Soares' allegations cannot support a fraudulent misrepresentation claim because they are too vague, see [Compl. ¶ 7 ("they represented that the AHR Systems, and the vehicles outfitted with those systems, were safe"); id. ¶ 32 ("The Defendants intentionally misrepresented . . . that [the Subject Cars] were free from defects . . ."); id. ¶ 37 (noting that Mr. Soares "relied in part on FCA's assurances that the [Car] was safe, along with FCA's advertisements and the materials available on FCA's website concerning the [Car's] safety features")], and/or identify non-actionable puffery, see [id. ¶ 21 ("over 70 available safety and security features"); id. ("beneath the surface of the Jeep Grand Cherokee lies a work of safety . . . systems that give you confidence behind the wheel and help protect you and your passengers"); id. ("[vehicles] have 80+ standard and available safety features"); id. ("Equipped to Protect"); id. ("[FCA]'s care for future generations meet[s] your safety standards")].  Accordingly, his affirmative misrepresentation claim fails.

Mr. Soares has also failed to adequately plead a fraud-by-omission claim.  "To show fraud by omission, the plaintiff must allege 'both concealment of material information and a duty requiring disclosure.'"  Buffalo-Water 1, LLC v. Fidelity Real Estate Co., 111 N.E.3d 266, 277 (Mass. 2018) (quoting Sahin v. Sahin, 758 N.E.2d 132, 138 n.9 (Mass. 2001)).  First, because Mr. Soares' allegations do not plausibly suggest that FCA was aware of the alleged defect in April 2015, when he purchased the Car, there was no material information for FCA to conceal at the time of purchase.[14]  Beyond the conclusory allegations that FCA "knew about the defects by or before 2010," [Compl. ¶ 31], and "acquired [its] knowledge of the AHR defect prior to the time that [Mr.] Soares purchased" the Car, [id.], there is nothing in the complaint that plausibly suggests that FCA knew about the alleged defects before June 2015, see [id. ¶ 26 (noting that in a "three-year period prior to October 2018, consumers lodged approximately 94 complaints with the [NHTSA]"; id. (earliest NHTSA dated June 8, 2015)].  Second, Mr. Soares has failed to adequately allege a duty to disclose.

> A duty to disclose exists where "(i) there is a fiduciary or other similar relation of trust and confidence, (ii) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading, or (iii) the nondisclosed fact is basic to, or goes to the essence of, the transaction."

Knapp v. Neptune Towers Assocs., 892 N.E.2d 820, 824 (Mass. App. Ct. 2008) (quoting Stolzoff v. Waste Sys. Int'l, Inc., 792 N.E.2d 1031, 1044 (Mass. App. Ct. 2003)).  Mr. Soares has not alleged a fiduciary relationship or anything similar (nor could he plausibly argue that such a relationship existed).  Additionally, he has not identified a partial or ambiguous statement of fact concerning a particular safety feature that required FCA to disclose the alleged defect.  See

---

[14] This is not necessarily fatal to Mr. Soares' Chapter 93A claim because learning that the AHR headrests were defective *after* selling the Car to Mr. Soares and subsequently failing to issue a recall could constitute unscrupulous conduct in violation of Chapter 93A.

Squeri v. Mount Ida Coll., 954 F.3d 56, 70 (1st Cir. 2020) (finding that there was no duty to disclose where defendants made no partial or ambiguous statements concerning the relevant topic).  FCA's general statements about the safety of its cars, which amount to non-actionable puffery, do not create a duty to disclose all safety-related facts.  Finally, the allegedly defective headrests do not go to the essence of Mr. Soares' transaction with FCA which involved the purchase of the Car.[15]

Thus, Mr. Soares' fraud claim fails, and FCA's motion to dismiss Count II, [ECF No. 26], is GRANTED.

       3.    Count III: Breach of Express Warranty

In Count III, Mr. Soares alleges that FCA breached its express warranty to cover "the cost of all parts and labor needed to repair any item on [his] vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."  [Compl. ¶¶ 83–87].  Mr. Soares has not plausibly alleged that FCA breached this express warranty because, by his own admission, he never asked FCA to cover the costs of repair.  Rather, he avers only that he "conducted research to determine" if FCA would honor the warranty and

---

[15] The fact that safety was one of the primary reasons that Mr. Soares bought the Car, [Compl. ¶ 37], does not mean that the effectiveness of the headrests goes to the essence of the transaction. Nothing in the complaint suggests that FCA was aware of Mr. Soares' reasons for buying the Car and therefore would have no reason to believe that headrest safety was basic to the transaction. See Restatement (Second) of Torts § 551(2)(e) (1977) ("One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated facts basic to the transaction, *if he knows that the other is about to enter into it under a mistake as to them*, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." (emphasis added)); see also Knapp, 892 N.E.2d at 824 (relying on Restatement in discussion of duty to disclose).

concluded that it would not.  [Id. ¶ 40].[16]  Mr. Soares cannot sustain a breach of express warranty

claim based solely on an expectation or assumption, even one founded on research, that FCA

would have breached had it been given the opportunity.[17]  Cf. Taupier v. Davol, Inc., 490 F.

Supp. 3d 430, 437 (D. Mass. 2020) (noting that an express warranty claim is essentially

contractual, and the plaintiff must demonstrate that the defendant did not deliver on its

contractual obligations).  Thus, FCA's motion to dismiss Count III, [ECF No. 26], is

GRANTED.[18]

### 4.    Count IV: Breach of Implied Warranty

In Count IV, Mr. Soares alleges that FCA breached the implied warranty of

merchantability by selling him a car with defective headrests.  [Compl. ¶¶ 88–93].  FCA argues

that this claim is time-barred because Mr. Soares' complaint was filed more than four years after

he bought the Car in April 2015.  [ECF No. 27 at 24].  Mr. Soares responds that he could not

have learned about the defective headrest until it deployed in 2020, and that, therefore, under the

---

[16] He also alleges that "[w]hen FCA does repair an AHR System, it merely replaces the deployed defective headrest with an un-deployed, but still defective, headrest."  [Compl. ¶ 8].

[17] Mr. Soares attempts to avoid dismissal by arguing that "seeking a repair would have been futile and the remedy of repair would have failed for its essential purpose."  [ECF No. 37 at 6].  This argument is unavailing.  In Rothbaum v. Samsung Telecommunications America, LLC, the case that Mr. Soares primarily relies on, the defendant actually gave the plaintiff a replacement cellphone, but the plaintiff alleged that it too was defective.  52 F. Supp. 3d 185, 197–99 (D. Mass. 2014).  Here, FCA was not given the opportunity to remedy the alleged issue because Mr. Soares did not try to enforce the warranty.

[18] For essentially the same reasons discussed in connection with Mr. Soares' implied warranty claim, infra Section III.B.4, the Court finds that Mr. Soares' express warranty claim is also time-barred, see Trans-Spec Truck Serv., 524 F.3d at 322–25 (finding that a warranty similar to the one at issue here did not extend to future performance and was therefore subject to § 2-725(2)'s four-year statute of limitations).

discovery rule, the four-year statute of limitations did not begin to run until the headrest deployed, making his claim timely.  [ECF No. 35 at 23–25].

Mr. Soares asserts his implied warranty claim under the Massachusetts version of the Uniform Commercial Code ("UCC").  [Compl. ¶¶ 88–93]; see also Taupier, 490 F. Supp. 3d at 439 (noting that because Massachusetts does not recognize strict products liability, plaintiffs typically assert claims under the implied warranty provisions of the UCC, which is a functional equivalent).  Under the UCC, an implied warranty claim must be made within four years of when the cause of action accrues.  Mass. Gen. Laws ch. 106, § 2-725(1).

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Id. § 2-725(2).

Courts applying Massachusetts law have routinely found that because an implied warranty does not extend to future performance, breach of implied warranty claims brought more than four years after delivery are time-barred by § 2-725(2).  See, e.g., Bessette v. IKO Indus., Inc., No. 19-cv-40017, 2020 WL 6110943, at *5 (D. Mass. Aug. 18, 2020) ("[Plaintiff] is unable to rely on the 'future performance' exception to § 2-725(2) because 'an implied warranty, by its nature, does not extend to future performance.'" (quoting Marks v. Andersen Windows, Inc., 14-cv-10171, 2015 WL 13313489, at *10 (D. Mass. Jan. 16, 2015))), report and recommendation adopted, Order Adopting R. & R., Bessette, No. 19-cv-40017 (D. Mass. Sept. 14, 2020), ECF No. 69; Garick v. Mercedes-Benz USA, LLC, No. 17-cv-12042, 2019 WL 3815178, at *5 (D. Mass. Mar. 29, 2019) ("An implied warranty, by its nature, does not extend to future performance." (quoting New England Power Co. v. Riley Stoker Corp., 477 N.E.2d 1054, 1056

n.4 (Mass. App. Ct. 1985))); <u>Pagliaroni v. Mastic Home Exteriors, Inc.</u>, 310 F. Supp. 3d 274, 283

(D. Mass. 2018) ("First, 'an implied warranty, by its nature, does not extend to future

performance.'  Therefore, [plaintiff]'s breach of implied warranty claims accrued from the date

of delivery . . . ." (quoting <u>Howard v. IKO Mfg., Inc.</u>, 2011 Mass. App. Div. 191, *3 (Mass. Dist.

Ct. 2011))); <u>Coady v. Marvin Lumber & Cedar Co.</u>, 167 F. Supp. 2d 166, 170 (D. Mass. 2001)

(finding that breach of implied warranty occurred upon delivery of goods and therefore claim

was untimely because it was brought more than four years after purchase); <u>New England Power

Co.</u>, 477 N.E.2d at 1056 n.4 ("We are not dealing with warranties as to future performance. . . .

'[A]n implied warranty, by its very nature, cannot explicitly extend to future performance.'"

(quoting <u>Holdridge v. Heyer-Schulte Corp. of Santa Barbara</u>, 440 F. Supp. 1088, 1104

(N.D.N.Y. 1977))); <u>Howard</u>, 2011 Mass. App. Div. at *3 ("Unlike a claim for breach of an

express warranty extending to future performance, however, an implied warranty, by its nature,

does not extend to future performance.").  Accordingly, because Mr. Soares bought the car in

April 2015 and did not file suit until October 2020, his implied warranty claim is time-barred.

Mr. Soares seeks to invoke the discovery rule to save his claim.  [ECF No. 35 at 23–25].

Pursuant to Massachusetts' general discovery rule, a cause of action does not accrue until a

plaintiff knows or reasonably should know that he was injured by the defendant's conduct.  <u>See

First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.</u>, 717 F. Supp. 2d 156, 164 (D. Mass.

2010).  The discovery rule, however, does not supersede the UCC, <u>see</u> <u>Cambridge Plating Co. v.

Napco, Inc.</u>, 991 F.2d 21, 25 (1st Cir. 1993) ("Not all contractual causes of action in

Massachusetts are governed by the judicially crafted accrual rules.  Claims alleging breach of a

contract for the sale of goods instead are subject to the detailed provisions of the UCC."), which

provides that warranty claims are subject to a four-year statute of limitations "regardless of the

aggrieved party's lack of knowledge of the breach" unless the "warranty explicitly extends to future performance of the goods," Mass. Gen. Laws ch. 106, § 2-725(1)–(2).

Thus, because Mr. Soares' implied warranty claim is time-barred, FCA's motion to dismiss Count IV, [ECF No. 26], is <u>GRANTED</u>.

5.    <u>Count V: Unjust Enrichment</u>

In Count V, Mr. Soares alleges that FCA was unjustly enriched by selling him a car with faulty headrests. [Compl. ¶¶ 94–98]. FCA argues that Mr. Soares' claim fails because he has adequate remedies at law. [ECF No. 27 at 25]. Mr. Soares counters that, at least at this stage of the litigation, he is entitled to assert alternative theories even if he may not ultimately recover on all of them. [ECF No. 35 at 26].

> Unjust enrichment is an equitable remedy, which exist[s] to supplement those available at law and not to contradict the judgments embodied in the statutes and the common law. Thus, a party with an adequate remedy at law cannot claim unjust enrichment. Specifically, [i]t is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment.

<u>Tomasella v. Nestlé USA, Inc.</u>, 962 F.3d 60, 82–83 (1st Cir. 2020) (alterations in original) (citations and internal quotation marks omitted). Here, there are adequate remedies at law available to Mr. Soares, including Chapter 93A, fraud, and breach of warranty. The fact that Mr. Soares has failed to adequately state such claims is immaterial. <u>See Shaulis v. Nordstrom, Inc.</u>, 865 F.3d 1, 16 (1st Cir. 2017) ("Although [the plaintiff] argues that, if her other claims are dismissed, she effectively has no adequate remedy, this argument misapprehends the relevant law. It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment."). Further, unlike in <u>Lass v. Bank of America</u>, the case upon which Mr. Soares primarily relies, there is no ambiguity as to whether these legal remedies are actually available to him. 695 F.3d 129, 131 (1st Cir. 2012) ("Given the ambiguity as to the lender's authority to increase the coverage requirement, [plaintiff] is entitled to proceed with her breach

29

of contract and [unjust enrichment] claim[].”); <u>see</u> <u>Tomasella</u>, 962 F.3d at 84 (distinguishing

<u>Lass</u> and noting that because there was no ambiguity casting doubt on whether a particular legal

remedy was available, the plaintiff's unjust enrichment claim was barred); <u>Green v. D2L Ltd.</u>,

No. 20-cv-10241, 2021 WL 276228, at *2 (D. Mass. Jan. 27, 2021) (“[A] district court may not

dismiss a claim for unjust enrichment simply on the basis that a plaintiff also seeks a claim for

breach of contract.  Instead, the district court must first ascertain whether there is ambiguity in

the contract that ‘casts doubt on whether a breach of contract claim was indeed available as a

legal remedy for the plaintiff.’” (quoting <u>Tomasella</u>, 962 F.3d at 84)).  Accordingly, Mr. Soares

is precluded from bringing his unjust enrichment claim, and FCA's motion to dismiss Count V,

[ECF No. 26], is therefore <u>GRANTED</u>.

## IV.     CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss, [ECF No. 26], is

<u>GRANTED</u> in part and <u>DENIED</u> in part.  The complaint, as asserted against Grammer, is

dismissed in its entirety for lack of personal jurisdiction.  As to FCA, Counts II, III, IV, V, and

VI are dismissed, and Counts I and VII remain.

If Mr. Soares believes he can revive his dismissed claims against FCA by amending the

complaint, he may do so.  No more than seven (7) days after the entry of this Order, Plaintiffs

shall inform the Court in writing as to whether they will be filing an amended complaint.  The

Court will then set an appropriate schedule.

        **SO ORDERED.**

June 8, 2021                                                        /s/ Allison D. Burroughs
                                                                   ALLISON D. BURROUGHS
                                                                   U.S. DISTRICT JUDGE