UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIA COSTA, *individually*, and MARIO SOARES, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> FCA US LLC f/k/a CHRYSLER GROUP LLC, <br><br> Defendant. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> *   Civil Action No. 20-cv-11810-ADB |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Mario Soares ("Soares") and Maria Costa ("Costa," together, "Plaintiffs") allege they were injured by defective automatic headrests ("AHRs") installed in vehicles sold by Defendant FCA US LLC ("FCA"). Soares—seeking to represent two classes of Massachusetts residents who own FCA cars with these headrests—asserts a claim for economic losses allegedly caused by FCA's statements and actions concerning the headrests. Currently before the Court is Plaintiff Soares' motion to certify classes, [ECF No. 62], FCA's motion for summary judgment on all counts, [ECF No. 82], and FCA's motions to exclude certain expert testimony, [ECF Nos. 84, 86].

For the reasons discussed below, FCA's motions to exclude expert testimony, [ECF Nos. 84, 86], are <u>DENIED</u>; FCA's motion for summary judgment, [ECF No. 82], is also <u>DENIED</u>; and Soares' motion to certify classes, [ECF No. 62], is <u>GRANTED</u> in part and <u>DENIED</u> in part.

# I.        PROCEDURAL BACKGROUND

Plaintiffs filed a seven-count complaint on October 2, 2020 asserting claims against FCA and the manufacturer of the headrest.  [ECF No. 1].  The Court earlier dismissed the manufacturer for lack of personal jurisdiction and dismissed five of the counts asserted in the complaint, leaving only Soares' Chapter 93A claim and Costa's negligence claim.  [ECF No. 41].  Soares then filed a motion to certify two classes on November 19, 2021, [ECF No. 62], which FCA opposed, [ECF No. 72], and Soares replied, [ECF No. 88].  On January 6, 2022, FCA filed a motion for summary judgment on both counts.  [ECF No. 82].  Plaintiffs opposed summary judgment on February 3, 2022, [ECF No. 99], and FCA replied to their opposition on February 17, 2022, [ECF No. 102].  FCA has also filed two motions to exclude the opinions and testimony of Plaintiffs' expert witnesses, Dr. Francesco Biondi ("Dr. Biondi") and Dr. Mariusz Ziejewski ("Dr. Ziejewski").  [ECF Nos. 84, 86].  Plaintiffs opposed both motions.  [ECF Nos. 94, 95].  The parties have also filed supplemental materials.  See [ECF Nos. 104–08].

# II.       MOTIONS TO EXCLUDE EXPERT TESTIMONY

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).[1]  Federal Rule of Evidence 702 provides that a person

> who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[1] "[T]he heavy weight of authority [is] that, when a party moves to exclude expert testimony proffered in support of a motion for class certification, the district court must perform a full Daubert analysis before certifying a class."  Campbell v. Nat'l R.R. Passenger Corp., 311 F. Supp. 3d 281, 296 (D.D.C. 2018).

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The district court has a gatekeeping role in which it must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.  The court must also consider whether the expert is "qualified in the specific subject for which his [or her] testimony is offered."  Garfield v. Gorilla, Inc., No. 13-cv-12810, 2015 WL 3874826, at *2 (D. Mass. June 23, 2015) (quoting Whiting v. Bos. Edison Co., 891 F. Supp. 12, 24 (D. Mass. 1995)).  The court's analysis, however, is "not limited to an appraisal of an expert's credentials and techniques but also entails an examination of his [or her] conclusions to determine whether they flow rationally from the methodology employed." Samaan v. St. Joseph Hosp., 670 F.3d 21, 32 (1st Cir. 2012).  In other words, if the analysis reveals "too great an analytical gap between the data and the opinion proffered," the expert's testimony should be excluded.  Id. (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

In Daubert, the Supreme Court provided a non-exhaustive list of factors that a court may consider in determining whether expert testimony is reliable:

(1) whether the scientific theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant scientific community.

Carrozza v. CVS Pharmacy, Inc., 391 F. Supp. 3d 136, 144 (D. Mass. 2019) (citing Daubert, 509 U.S. at 593–94).

Courts must be careful to focus on the principles or methodology involved in the expert's testimony, rather than solely on the conclusions ultimately drawn by the expert. Daubert, 509 U.S. at 595.

> Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' . . . it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.

Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998) (citing Daubert, 509 U.S. at 590–96)); see also Koninklijke Philips N.V. v. Zoll Med. Corp., 256 F. Supp. 3d 50, 52 (D. Mass. 2017) ("If an expert's testimony is within 'the range where experts might reasonably differ' the jury, not the trial court, should be the one to decide among the conflicting views of different experts.") (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999)). The First Circuit has warned district courts against exercising their "gatekeeping role under Daubert with too much vigor." Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 99 (1st Cir. 2020) (citation omitted).

The Court finds that the opinions of Plaintiffs' proffered experts Dr. Biondi and Dr. Ziejewski satisfy this standard. FCA's objections concerning the methodologies of both experts go to the weight of their proffered testimony, not their admissibility.

## A. Expert Opinion of Dr. Biondi

Dr. Biondi seeks to testify regarding the distraction potential and safety risk associated with the unintentional deployment of AHR systems[2] in vehicles manufactured by FCA. [ECF

---

[2] An AHR is a headrest that has a spring-activated safety feature that moves the headrest closer to the seat occupant in the event of a rear collision. [ECF No. 83 at 12]; see also [ECF No. 99 at

No. 95 at 5].  FCA moved to exclude Dr. Biondi's opinions and testimony because they are not

useful and are based on insufficient facts and unreliable methodologies.  [ECF No. 85 at 4, 7].

The Court will spend little time on Dr. Biondi's qualifications as they are undisputed.  He is an

expert in "human factors" and ergonomics, specifically as related to human-machine interfaces,

including cars.  [ECF No. 95 at 5, 7; ECF No. 85 at 6].  He has a lengthy academic career in this

area and has published dozens of peer-reviewed articles.  [ECF No. 95 at 7].

Dr. Biondi's report concludes that "the unexpected, unintended deployment of AHR may

result in a source of internal distraction for drivers [and] . . . may pose a safety risk."  [ECF No.

95-11 at 6 ("Biondi Rpt.")].  According to his report, the "loud sound and sudden impact [of

AHR deployment]" may startle a driver and cause them to visually or manually inspect the

vehicle, which could take their attention away from the primary task of driving.  [Id. at 6–7].

As a preliminary matter, FCA's argument that Dr. Biondi's conclusions amount to

nothing more than "theoretical possibilities" that are unhelpful to the trier of fact because of his

inclusion of the word "may" is unavailing.  [ECF No. 85 at 6].  Courts have acknowledged that

there are often no reliable methodologies that allow experts to testify with certainty and, as such,

a "lack of absolute certainty on the part of the expert does not render her opinion unreliable

under Daubert."  United States v. Monteiro, 407 F. Supp. 2d 351, 372 (D. Mass. 2006); Lawes,

963 F.3d at 109 (lack of certainty in an expert opinion goes to weight and not admissibility).

Moreover, as Dr. Biondi explained in his deposition, risk analysis in the field of distracted

driving is normally a question of possibility and probability.  See [ECF No. 95 at 13–14].  This

---

5].  This position helps reduce the likelihood of whiplash injuries.  [ECF No. 83 at 12].  The
AHR is triggered to deploy when a censor senses a rear impact, sending a signal to release two
"latch pawls" (hooks), which then release a steel striker pin (the pin is mounted in a plastic
"sled" with brackets), and the AHR moves forward into the new position.  [Id.].

conditional language also is notably absent in Dr. Biondi's rebuttal report.  See [ECF No. 95-8 ("Biondi Rebuttal") at 6 ("it is safe to conclude that the loud noise emitted by AHR deployment did in fact startle drivers and cause uncontrollable startling reactions"); 10 (certain customer behaviors in response to unexpected deployment "[are] to be considered a distraction.")].

Additionally, Dr. Biondi's opinion is based on sufficient data and reliable methodologies. In preparing his opinion, he relied on his "scientific experience evaluating driver-automobile interactions, relevant literature, and his review of hundreds of complaints from consumers who experienced unexpected AHR deployments[.]"  [ECF No. 95 at 5].  He also reviewed materials about the AHR defect specific to this case, deposition testimony, and FCA's videos of AHR deployment, [id. at 17], which provided enough information upon which to base an opinion. FCA questions his reliance on the "subjective" facts recited in consumer complaints and on a Volkswagen study that FCA asserts is not sufficiently analogous to inform his opinion in this matter, [ECF No. 85 at 8–12], but these challenges to some of the facts and literature underlying Dr. Biondi's testimony are largely attacks on Dr. Biondi's credibility—which FCA can raise during cross examination at trial—and do not speak to admissibility, Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007) (Objections "which question the factual underpinnings of an expert's investigation, often go to the weight of the proffered testimony, not to its admissibility . . . . [T]hese matters are for the jury, not the court."); Laureano v. City of New York, No. 17-cv-181, 2021 WL 3272002, at *4 (S.D.N.Y. July 30, 2021) (that a biomechanics expert "did not rely on literature or studies that involve this exact factual scenario . . . does not undermine the general utility of biomechanics analysis"); see also [Biondi Rebuttal at 5–8 (responding to FCA's expert's attacks on his opinion)].

FCA further argues that Dr. Biondi's opinions are inadmissible because he did not conduct his own testing to measure the safety risk of AHR deployment, [ECF No. 85 at 10–12], but this alleged shortcoming similarly does not warrant exclusion, see Botelho v. Nordic Fisheries, Inc., No. 15-cv-11916, 2018 WL 2291315, at *3 (D. Mass. May 18, 2018) ("Plaintiff's expert is not required to perform any particular tests in order to arrive at his opinion.").  "Experts . . . may testify solely on the basis of experience[,]" McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418, 426 (D. Mass. 2008) (citation omitted), so long as the expert "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," id.  This type of ergonomics analysis is well-established, see Hewitt v. Metro-N. Commuter R.R., 244 F. Supp. 3d 379, 388 (S.D.N.Y. 2017), and Dr. Biondi's expertise in the area is unquestioned.  Dr. Biondi reviewed the relevant literature and applied his knowledge to the facts of this case to form his conclusions.  See [ECF No. 95 at 15–18, Biondi Rpt., Biondi Rebuttal].  Accordingly, his opinions are sufficiently reliable to present to a jury.  See Hewitt, 244 F. Supp. 3d at 388 ("Given . . . the profusion of scientific literature on ergonomics and [expert's] general familiarity with the science—the [c]ourt concludes that [the expert] could permissibly rely upon materials other than personal observations of [plaintiff] to form his opinions about the ergonomic risk factors present in [plaintiff's] particular workplace."); Michaels v. Mr. Heater, Inc., 411 F. Supp. 2d 992, 999–1000 (W.D. Wis. 2006) ("Although he performed no studies or tests in conjunction with this case, the theories and methods upon which [human factors expert] relies are recognized by the engineering community. . . . [his] credentials are impressive, and his knowledge of warnings and their proper design may be helpful to the jury. Therefore, his testimony is admissible.").

B.      **Expert Opinion of Dr. Ziejewski**

Dr. Ziejewski is an engineer who specializes in the field of vehicle dynamics and biomechanics, and human body biomechanics, including injuries to the brain.  [ECF No. 94 at 4; ECF No. 87-8 ("Ziejewski Rpt.")].  Here, he was hired to opine on the biomechanical consequences of unexpected AHR deployment.  [Id.]; see also [ECF No. 99 at 12].  FCA seeks to exclude his opinions and testimony, asserting that his methods are unreliable and his opinion is outside the scope of his expertise.  [ECF No. 87 at 4].

First, FCA argues that Dr. Ziejewski is not qualified to opine on whether the force of unexpected AHR deployment can cause traumatic brain injury because he is an engineer, not a medical doctor.  [ECF No. 87 at 11–13].  While the Court agrees that Dr. Ziejewski cannot opine on a specific medical injury, *i.e.* he cannot opine on whether Soares suffered any injury or whether the AHR caused Soares any injury, he can opine on general causation, *i.e.* the forces involved in AHR deployment and the effects of those forces on any object or the human body. See Fox v. Omron Healthcare, Inc., No. 13-cv-11976, 2016 WL 7826661, at *4 (D. Mass. Aug. 9, 2016) (holding that general medical causation pertains to whether what is at issue (*e.g.*, a device) is capable of causing injury, whereas specific causation pertains to whether what is at issue was, in fact, "a substantial factor" in causing the injuries suffered).  Plaintiffs maintain that Dr. Ziejewski will not opine on specific injury causation, [ECF No. 94 at 10], and his testimony will be so limited.

FCA also argues that Dr. Ziejewski cannot state that AHR deployment causes "a traumatic brain injury" at all because that is a specific medical diagnosis outside of his area of expertise.  [ECF No. 87 at 11–13].  Courts, however, routinely allow this kind of testimony from biomechanics experts to be presented to a jury.  See Fox, No. 13-cv-11976, 2016 WL 7826661,

at *4 (admitting engineer's testimony as to whether defects were generally capable of causing arm injuries); Laski v. Bellwood, No. 99-cv-01063, 2000 WL 712502, at *3 (6th Cir. May 25, 2000) ("[B]iomechanics are qualified to determine what injury causation forces are in general and can tell how a hypothetical person's body will respond to those forces, but are not qualified to render medical opinions regarding the precise cause of a specific injury.") (internal quotation marks omitted); Rodriguez v. Athenium House Corp., No. 11-cv-05534, 2013 WL 796321, at *4–5 (S.D.N.Y. Mar. 5, 2013) (ruling that a biomechanical engineer may testify "about the nature and amount of force generated by the accident in question and the observed effect of that force on a human body in comparable accidents[,]" but is not qualified to offer a medical opinion as to whether a specific accident caused plaintiff's injuries); Fox v. Gen. Motors LLC, No. 17-cv-00209, 2019 WL 3483171, at *8 (N.D. Ga. Feb. 4, 2019) (engineer is qualified to testify on the relationship between roof crush and neck injury potential); Bowers v. Norfolk S. Corp., 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007) ("[A] biomechanical engineer . . . may testify as to the effect of locomotive vibration on the human body and the types of injuries that may result from exposure to various levels of vibration" but not about "whether the vibration in [the] locomotive caused Plaintiff's injuries.").  FCA relies heavily on Wagoner v. Schlumberger Tech. Corp., No. 07-cv-00244, 2008 WL 5120750, at *1 (D. Wyo. June 19, 2008), in which a district court prohibited Dr. Ziejewski from opining on the alleged brain injury sustained by the plaintiff because he is not a medical doctor.  [ECF No. 87 at 12].  Nevertheless, that court ultimately concluded that he "may, for example, testify as to the forces involved in the low speed accident and how those forces may affect an individual or object" but "not express any opinions regarding whether plaintiff . . . has suffered a brain injury in this case or as to the

probable the cause of the alleged brain injury."  Wagoner, 2008 WL 5120750, at *1.  That is no

different from this Court's conclusion here.

Additionally, the Court finds that Dr. Ziejewski's methodologies are sufficiently reliable

for the purposes of Daubert.  In short, Ziejewski used a mathematical formula for angular

acceleration to measure the forces of a deployed AHR.  [Ziejewski Rpt. at 7–13].  FCA argues

that his opinion is unreliable because it was based on an unreliable formula that he "concocted"

to inappropriately measure "angular" or "rotational" acceleration; that he did not use data from

crash test dummies or live human subjects; and that the variables he used in his formula

contained errors.  See [ECF No. 87 at 13–15].  Dr. Ziejewski, however, cites to relevant literature

to support the use of the angular acceleration calculation and, based on that, the Court finds the

formula sufficiently reliable.  [Ziejewski Rpt. at 7, 11–12].  The remainder of FCA's arguments

serve only to compare Dr. Ziejewski's opinion unfavorably to its own expert's opinion, but they

do not render his opinion unreliable.  That he did not choose to apply the same methods as

FCA's expert—a choice that he explains in his report and his deposition testimony—does not

render his opinion "unreliable" or methodologically flawed such that exclusion is warranted.  See

Ruiz-Troche, 161 F.3d at 85 ("Daubert does not require that a party who proffers expert

testimony carry the burden of proving to the judge that the expert's assessment of the situation is

correct. As long as an expert's scientific testimony rests upon 'good grounds, based on what is

known[.]'") (citing Daubert, 509 U.S. at 590).

Contrary to FCA's assertions, there is evidence in the record that Dr. Ziejewski's

principles and methodology are generally accepted by experts in the field; that they are based on

sufficient facts and data; and that he has reliably applied his principles and methods to the facts

of this case.  FCA may disagree with his opinion and that disagreement may be a basis on which

to challenge his opinion on cross-examination, but it is not a sufficient basis for excluding his

testimony.

## III.    MOTION FOR SUMMARY JUDGMENT

### C.    Factual Background

While the parties agree on some basic underlying facts, many of the material facts in this

case remain disputed.[3]

#### 1.    Plaintiffs' Experience with their 2015 Jeep Grand Cherokee

Soares purchased a 2015 Grand Cherokee on May 22, 2015, at least in part because he

had read that the vehicles were particularly safe.[4]  [ECF No. 83 at 10; ECF No. 99 at 8].  The

incident underlying this case occurred as follows.

> On February 17, 2020, Mr. Soares was driving the Jeep with his wife, Maria Costa,
> in the front passenger seat.  While Mr. Soares and Ms. Costa were parked, the AHR
> in the passengerside headrest [u]nexpectedly [d]eployed, creating a loud sound and
> striking Ms. Costa in the back of the head . . . Ms. Costa immediately indicated that
> she was in pain, and Mr. Soares drove her home . . . Ms. Costa subsequently sought
> medical treatment and was told that she may have suffered a concussion as a result
> of being struck by the headrest. Since the incident, Ms. Costa has had regular
> migraine headaches and still has neck pain.

[ECF No. 99 at 8]; see also [ECF No. 83 at 11–12].  Costa did not seek medical attention

until "days" after the deployment.  [ECF No. 83 at 11].  She did not suffer a cervical

---

[3] Unless otherwise noted, the Court draws the facts from FCA's statement of undisputed material facts, [ECF No. 83 at 10–16], Plaintiffs' responsive statement of disputed material facts and additional material facts, [ECF No. 99 at 8–15], and the documents referenced therein.  Parts of those public filings have been redacted, but unredacted filings have been provided to the Court under seal.

[4] FCA does not dispute that Soares "generally" researched the safety of the vehicle online before purchase, but asserts that he did not research or review any complaints specifically regarding the 2015 Jeep Grand Cherokee prior to his decision to purchase one.  [ECF No. 83 at 11].

fracture, and her medical records indicate that she was "negative for acute pathology."
[ECF No. 83 at 11–12].

Soares took the vehicle to Posner Park Dodge for repair, which advised him that the
plastic bracket inside the headrest had cracked and that the entire headrest needed to be replaced.
[ECF No. 99 at 8].  Soares continued to drive the car with the broken headrest.  [ECF No. 83 at
11].  FCA paid for replacement of the passenger-side headrest, which was installed on or about
March 12, 2021.  [ECF No. 99 at 8; ECF No. 83 at 11].  Soares received a second free
replacement AHR two months later due to minor cosmetic damage, unrelated to any mechanical
issues.  He never personally contacted an FCA dealership regarding the repair.  [ECF No. 83 at
11].

Soares does not feel the vehicle, with an undeployed AHR in the driver seat, is safe to
drive, but must continue driving it "for economic reasons."  [ECF No. 99 at 9].  He asserts that if
FCA had disclosed to him that the car was outfitted with a defective AHR, he would not have
purchased it or would have paid significantly less for it.  [Id.].

2.      FCA's Knowledge of the Defect

FCA contends that it learned for the first time in April 2016—after Soares purchased his
car—of an AHR that had deployed and had a broken sled.  [Id. at 13].  FCA and the AHR
manufacturer initiated a joint investigation that same year to determine the exact cause of the
broken sled.  [Id.].  The investigation concluded that an out-of-place oil on the striker pin caused
environmental stress cracks ("ESC") in the plastic sled, leading to the failure of the sled and
inadvertent deployment.  [Id. at 14].  By August 2017, though FCA had still not identified the
exact source of the oil on the pins, it began to wash the pins with alcohol to eliminate any further

contamination.  [ECF No. 83 at 14].[5]  FCA alleges that there was no evidence of ESC in or around the striker pin retention brackets during pre-launch testing.  [ECF No. 83 at 13].

Plaintiffs dispute this account.  According to Plaintiffs, FCA knew or should have known that its headrests were defective as early as 2009, when it conducted pre-market testing during which "numerous headrests exploded due to cracking in the sleds."  [ECF No. 99 at 9, 16].[6] Plaintiffs' expert opines that the plastic sled was manufactured from a material that is incompatible with an oil compound used during the manufacture and assembly of the headrests, placing the unit at risk of unintended deployment.  [ECF No. 99-32 (Davis Rpt.) at 5, 10].  The expert states that this issue should have been known to FCA when it designed the headrests because of the numerous headrests that failed during the pre-market testing.  [ECF No. 99 at 16]; see also [Davis Rpt. at 70–71].  Plaintiffs further assert that their "expert and even FCA's own engineers have testified that had these failures been adequately investigated in 2009, the problems with ESC would have been discovered at that time."  [ECF No. 99 at 9, 16]. Additionally, Plaintiffs contend that, in 2011, FCA investigated a spike in warranty claims caused by broken sleds and that "[m]any of these 2011 failures were instances where an AHR had failed due to ESC[,]"  [id.]; see also [id. at 10 (citing testimony discussing that the manufacturer had received at least two reports of broken sleds in October 2011)], and that FCA began receiving reports of injuries resulting from inadvertent deployment as early as 2013, [id. at 10 (citing testimony of FCA engineer discussing a 2013 complaint where a driver's side headrest

---

[5] FCA asserts that it only learned of the actual source of the oil by engaging in discovery for another litigation stemming from the same alleged defect.  [ECF No. 83 at 14].

[6] FCA acknowledges that sleds did fracture during testing, but says that they fractured in a different region of the sled and that the manufacturer changed the design to resolve those fractures.  [ECF No. 83 at 13].

inadvertently deployed while the customer was driving and caused him soreness and whiplash].
Plaintiffs also report that "internal FCA documents show that by the time Mr. Soares purchased
his vehicle in May 2015, FCA had already received more than 592 warranty claims and 265
customer complaints. Of these 265 complaints, 15 involved legal claims related to an exploded
headrest and 17 reported injuries."  [Id. at 11].

        3.    Safety Risks

      FCA conducted a series of tests to determine the risk of injury associated with inadvertent
deployment and concluded that the risk of such injury was "essentially zero, regardless of an
individual's size or sex[,]" and FCA senior management found that the "ADR deployments had
no effect on motor vehicle safety."  [ECF No. 83. at 14]; see also [ECF No. 83-17; ECF No. 83-
18 at 23 ("Reinhart Rpt.") (AHR deployment testing revealed "no risk for a head
injury/concussion or neck injury" or spine injury)].  FCA reports that only one percent of
complaints regarding inadvertent AHR deployment involved distraction, and that there were six
reports of minor accidents resulting from inadvertent AHR deployment, none of which could be
confirmed.  [ECF No. 83 at 15].  Plaintiffs, in turn, offer evidence that this testing was
inadequate because "FCA never took the risk of driver distraction seriously, did not consult with
any doctors or biomechanical engineers, did not investigate circumstances where individuals
reported being involved in an accident following a deployment, and did not interview individuals
who claimed to have been injured by the headrests."  [ECF No. 99 at 13]; see also [ECF No. 99-
36 at 39:11–44:17 (FCA employee testimony); ECF No. 99-25 (FCA document noting that it had
inspected the vehicles involved in accidents allegedly caused by inadvertent AHR deployment,
but not indicating that any occupants, or victims, were interviewed)].

Plaintiffs aver that FCA vastly understates the risks associated with inadvertent AHR deployment.  In addition to attacking FCA's investigation, Plaintiffs cite the following statistics from the National Highway and Transportation Safety Administration ("NHTSA"):

> FCA has received 4,030 Complaints concerning failed headrests . . .; Of those complaints 439 alleged that the customer sustained an injury (the majority of which occurred in women and children). . . ; 404 individuals were so concerned about the issue that they reported their experiences directly to NHTSA . . . ; There have been 471 lawsuits or legal claims involving alleged headrest failures . . . ; and 7 consumers have reported being involved in an accident as a result of driver distraction following a deployment.

[ECF No. 99 at 11].[7]  Additionally, Plaintiffs' expert biomechanical engineer, Dr. Ziejewski, concludes that a deployed headrest has the potential to cause injury, [id. at 12; see also [Ziejewski Rpt.], and Plaintiffs' human factors expert, Dr. Biondi, concludes that the unexpected

---

[7] Plaintiffs also have asked the Court to take judicial notice of a new supplemental summary of complaints, obtained from NHTSA's website, that show there have been numerous additional failures reported to NHTSA since November 2021.  [ECF Nos. 104, 105].  FCA argues that the request constitutes an improper Rule 56(d) motion to delay consideration of the motion for summary judgment.  [ECF No. 106].

Courts may take judicial notice at any stage of the proceeding, Fed. R. Evid. 201(d); Noonan v. Staples, Inc., 707 F. Supp. 2d 85, 89 (D. Mass. 2010), including information from an official government website that is "not subject to reasonable dispute[,]" Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010); Lussier v. Runyon, 50 F.3d 1103, 1113 (1st Cir. 1995).  "Not all records in the possession of a public agency are 'official public records' susceptible to judicial notice." O'Hara v. Diageo-Guinness, USA, Inc., 306 F. Supp. 3d 441, 457 (D. Mass. 2018), on reconsideration, 370 F. Supp. 3d 204 (D. Mass. 2019). "Some documents, such as police reports, lack the 'indicia of reliability' that place 'official records, such as birth or death certificates and other similar records of vital statistics 'beyond reasonable dispute.'" Id.  This document is more akin to a police report than the types of records that are "beyond reasonable dispute." Further, FCA is, in fact, disputing its reliability and Plaintiffs seem to be exclusively offering it for the truth of the matter asserted. Cf. O'Hara, 306 F. Supp. 3d at 457 (noting that "as a rule, courts now judicially notice the public acts, reports, records and regulations made, kept, conducted or issued by administrative agencies" but "generally may do so only to note the existence of the document, not for the truth of the facts recited therein") (citation omitted). Accordingly, the request for judicial notice, [ECF Nos. 104, 105], is denied without prejudice.

deployment may lead to unsafe audio and visual driver distractions, [id. at 13]; see also [Biondi

Rpt]. Plaintiffs' also emphasizes that FCA's own owner's manual warns of the risk of injury

from unexpected deployments, stating: "To avoid accidental deployment of the [AHR] ensure

that all cargo is secured, as loose cargo could contact the [AHR] during sudden stops. Failure to

follow this warning could cause personal injury if the [AHR] is deployed." [ECF No. 99 at 12].

    4.   <u>Vehicles Potentially Affected</u>

This AHR system was installed in over 8 million vehicles. [ECF No. 83 at 15; ECF No.

99 at 13]. 116,080 of those vehicles were sold or leased in Massachusetts. [Id.]. FCA asserts

only "a tiny percentage of those vehicles might be affected[,] [ECF No. 83 at 15–16], while

Plaintiffs assert that FCA's internal documents and testimony from its supplier support that "all

class vehicles may experience the defect," [ECF No. 99 at 14]. According to FCA, the oil was

inadvertently introduced during manufacturing, that it does not appear on all AHR pins, and that

projected AHR failure rates varied widely among the vehicles depending on the production

period. [ECF No. 83 at 15]. Plaintiffs contend, however, that all 2010 model vehicles share the

same common design, materials, and manufacturing process, including the sleds and striker pins,

and accordingly all were vulnerable to contamination and ESC. [ECF No. 99 at 13–15; Davis

Rpt. at 5 ("The specific choice of material by the manufacturer, the use of incompatible oil

compounds and the design of the AHR system itself places the unit in jeopardy of sudden and

unintended deployment while in service.")]; see also [ECF No. 99-36 at 64:1–8; 117:14–17

(testimony from FCA's head safety investigator that "it was basically the same mechanism that

went across all car lines" and "it was happening across all vehicles . . . [a]nd the parts . . . the

frame and the basic component is the same across all car lines")]; [ECF No. 99-10 at 138:11–14,

280:6–10 (testimony from manufacturer's director of engineering and program management in

North America that "[t]he sled is the same sleds used across these vehicle platforms, so the expectation would be [ESC] could – could occur in any one of these vehicle types[]" and that "pins with that incompatible substance are present in all [FCA] vehicles that had AHR systems . . . until August 2017"); 33:13–15 (the "composition of the striker pins" had not changed at any time"); 145:10–19 (it was "the same coating on all pins from the beginning of production").

The parties' experts also dispute each other's findings concerning their respective inspections of some 2010 model vehicles, with FCA's expert asserting that he found no oil on any of the pins in the headrests he examined, and Plaintiffs' expert stating that at least one of the pins he examined did have the oil present, [ECF No. 99 at 14–15; Davis Rpt. at 77]; [ECF No. 83-2 at 15; ECF No. 83-11 (MacLean Rpt.) at 10 (opining that "testing and analysis of undeployed AHR units determined that ESC did not and will not manifest in all AHR units installed in the alleged class vehicles" and "resin was a suitable material choice for the sled component of the subject AHR assembly"].

**D.    Legal Standard**

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  Id. (citation omitted). By invoking summary judgment, "the moving party in effect declares that the evidence is

insufficient to support the nonmoving party's case." United States v. Plat 20, Lot 17, 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must . . . 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted). That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6. The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation[,]" Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

### E.    Discussion

FCA has moved for summary judgment on both remaining counts against it.  See generally [ECF Nos. 82, 83].  Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that genuine disputes of material fact remain as to both claims.

### 1.    Soares' Chapter 93A Claim

Soares alleges that by selling him, and other consumers, a car with defective headrests, FCA engaged in an unfair and/or deceptive trade practice in violation of Mass. Gen. Laws ch. 93A. Chapter 93A, § 2(a) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  To plausibly state a Chapter 93A claim premised on a deceptive act, the plaintiff must allege "(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury."  Casavant v. Norwegian Cruise Line, Ltd., 919 N.E.2d 165, 168–69 (2009) (citing Mass. Gen. Laws ch. 93A, § 9).  An act or practice is deceptive if it "has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)."  Aspinall v. Philip Morris Cos, Inc., 813 N.E.2d 476, 488 (Mass. 2004); see also Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016). "In determining whether an act or practice is deceptive, 'regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have upon the general public.'"  Mayer v. Cohen-Miles Ins. Agency, Inc., 722 N.E.2d 27, 33 (Mass. App. Ct. 2000) (quoting Leardi v. Brown, 474 N.E.2d 1094, 1099 (Mass. 1985).

Liability under this statute is not limited to false or misleading affirmative statements. "A business may also violate [Chapter] 93A through an omission, [such] as when it 'fails to

disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction.'" Carlson v. The Gillette Co., No. 14-cv-14201, 2015 WL 6453147, at *4 (D. Mass. Oct. 23, 2015) (quoting 940 Mass. Code Regs. § 3.16(2)).  Such a violation must be "material, know[n], and willful nondisclosure," id. (quoting Underwood v. Risman, 605 N.E.2d 832, 835 (Mass. 1993)), and must "address[] conduct likely to mislead consumers acting reasonably under the circumstances[,]" Mayer, 722 N.E.2d at 33.  It can be deceptive "to simply remain silent, if [the seller] does so under circumstances that constitute an implied but false representation," such as where a misleading impression "arise[s] from the physical appearance of the product, or from the circumstances of a specific transaction, or . . . based on ordinary consumer expectations as to the irreducible minimum performance standards of a particular class of good." Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 72 (1st Cir. 2020) (quoting In the Matter of Int'l Harvester Co., 104 F.T.C. 949, 1057–58 (1984).  "Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of the inquiry.'" Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (citation omitted).  "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." Id. at 54 (quoting Ahern v. Scholz, 85 F.3d 774, 797 (1st Cir. 1996)).

FCA argues that it is entitled to summary judgment on the Chapter 93A claim because it had no knowledge of any ESC issues before Soares purchased his car in May 2015, and even if it did, such an omission did not mislead reasonable customers.  [ECF No. 83 at 16–22].  There is an abundance of material facts in dispute surrounding both questions, and FCA is therefore not entitled to summary judgment on this claim.  To the first question, Plaintiffs have pointed to

sufficient evidence that could allow a reasonable jury to conclude that FCA knew of issues with

the headrests prior to Soares' purchase.[8]

Likewise, the question of whether this information was material to a reasonable customer,

based on the rate of unexpected deployment, the safety risk, and any other ordinary consumer

expectations, involves disputes of fact properly reserved for the factfinder.

_____

[8] FCA takes issue with Soares' reference to consumer complaints. First, FCA avers that these types of complaints are insufficient to prove knowledge of a defect. [ECF No. 83 at 18]. The Court agrees that consumer complaints alone would be insufficient to show that FCA knew about the defect. See Berenblat v. Apple, Inc., No. 08-cv-4969, 2010 WL 1460297, at *9 (N.D. Cal. 2010) (consumer complaints alone were not sufficient to establish the company had knowledge of a problem). But, when coupled with the other evidence Soares offers, a reasonable juror could infer that FCA knew about the design defect in the sleds. This is especially true here where the consumer complaints indisputably relate to the exact defect at issue in this case. Cf. Utica Nat. Ins. Grp. v. BMW of N. Am., LLC, 45 F. Supp. 3d 157, 162 (D. Mass. 2014) (consumer complaints insufficient to demonstrate knowledge of a defect because the relationship of the complaint to the particular recall were "uncertain"); Schneider v. BMW of N. Am., LLC, No. 18-cv-12239, 2022 WL 1310457, at *13 (D. Mass. Apr. 22, 2022) (report of customer complaint that "contained no specific reference to" the alleged defect could not stave off defendant's summary judgment motion).

FCA also argues that the Court cannot rely on the consumer complaints when considering the instant motion because they are hearsay, inadmissible to prove the truth of the matter asserted. [ECF No. 102 at 4–5]. "[H]earsay evidence cannot be considered on summary judgment for the truth of the matter asserted[,]" Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 12 (1st Cir. 2016) (internal quotation marks and citations omitted), "unless it falls within one of the exceptions specified in the Federal Rules of Evidence[,]" Ramirez Rodriguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 76 (1st Cir. 2005). In considering this motion, the Court has not relied on the truth of the matter asserted in consumer complaints, but it is also not inclined to conclude that these complaints are inadmissible at this stage. At trial, Soares may argue that the consumer complaints, whether compiled by NHTSA or maintained by FCA, fall within a hearsay exception. In Trull v. Volkswagen of Am., Inc., 187 F.3d 88, 97 (1st Cir. 1999), the First Circuit declined to disturb a lower court's decision to allow expert testimony based, at least in part, on data "collected and reported pursuant to a legislative mandate by the NHTSA" because the data could fall under Fed. R. Evid. 803(8) or Fed. R. Evid. 703. See also Kramer v. Ford Motor Co., No. 12-cv-1149, 2016 WL 827746, at *17 (D. Minn. Feb. 29, 2016) (consumer complaints pulled from defendant's database are not hearsay when plaintiffs "do not intend to offer the recitations of the customer complaints for the truth of the assertions, but instead to show Defendant's notice of the alleged problem"). FCA may renew its objection to the consumer complaints at a later time if warranted.

FCA nevertheless argues that Soares cannot show that reasonable customers were misled by its omission of the defect, as a matter of law, because the AHR failure rate in a 2015 Jeep Grand Cherokee is less than 1 percent.  [ECF No. 83 at 19].  As an initial matter, Soares' expert disputes this calculation.  [ECF No. 99 at 18].  Further, courts have held that "[c]ertain categories of information are presumptively material, including . . . claims significantly involving health and safety, and claims pertaining to the central characteristic of the product."  Aspinall v. Philip Morris Co., Inc., No. 98-cv-06002, 2005 WL 3629358, at *3 (Mass. Super. Nov. 22, 2005) (internal quotation marks and citation omitted).  FCA's reliance on Carlson, 2015 WL 6453147, at *20–21 is misplaced.  There, the court dismissed a claim against a battery seller for failure to state a claim because the complaint "includ[ed] no allegations that state the extent of the [alleged] problem or even that the problem was significant, substantial, or widespread" such that "it [was] impossible to ascertain whether the 'potential to fail' was material."[9]

Finally, FCA argues that it is entitled to summary judgment because Soares has suffered no damages as the deployed headrest in his vehicle was replaced for free under the FCA warranty program.  [ECF No. 83 at 22].  This argument fails because, in addition to the cost of repairing or replacing the AHR, Soares also seeks to recover for the economic injury suffered as a result of purchasing a vehicle that is equipped with defective safety equipment.  [ECF No. 99 at 7, 19–21].  See Downing v. Keurig Green Mountain, Inc., No. 20-cv-11673, 2021 WL 2403811, at *3 (D. Mass. June 11, 2021); Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 8 (1st Cir. 2018);

---

[9] The other two cases on which FCA relies, a New Jersey state court opinion and a Third Circuit opinion, are non-binding, unpersuasive, and arguably undermine its claim.  See Coba v. Ford Motor Co., 932 F.3d 114, 126 (3rd Cir. 2019) (explaining that "the relevant question is not the actual rate of [the defect] viewed in hindsight, but what Ford knew and therefore could have disclosed to customers about that rate.").

Lee v. Conagra Brands, Inc., 958 F.3d 70, 80–81 (1st Cir. 2020).  FCA's arguments may

ultimately carry the day, but the factual issues will first need to be resolved by a factfinder.

        2.      Costa's Negligence Claim

Costa has also raised sufficient disputes of material fact to preclude summary judgment

on her negligence claim.  In Massachusetts, "[p]roof of design negligence requires satisfaction of

the following three elements: (1) the manufacturer's failure to exercise a reasonable degree of

care under the circumstances; (2) proximate causation; and (3) injury and/or loss."  Geshke v.

Crocs, Inc., 889 F. Supp. 2d 253, 261 (D. Mass. 2012).  A plaintiff must also show "'an available

design modification which would reduce the risk without undue cost or interference with the

performance of the [product],' and the jury must consider whether a safer alternative design was

available in deciding whether the defendant was negligent for failing to adopt that design.'"

Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1024 (Mass. 2013) (citation omitted).

FCA asserts that it is entitled to summary judgment on Costa's claim because (1) she has

no alternative design; (2) she did not inspect the AHR that injured her to determine whether there

was a manufacturing defect; and (3) she lacks a medical expert witness to prove causation.  [ECF

No. 83 at 22–25].

First, Costa has shown that a traditional, or "static," headrest is a feasible alternative

design.  [ECF No. 99 at 21].  FCA was outfitting other cars with traditional headrests even

during the relevant timeframe, and Costa's proffered expert additionally discusses three

alternative design options that could have prevented ESCs from occurring in an AHR.  [Id.].

Second, both Soares and Posner Park Dodge, where the vehicle was brought for repair,

inspected the headrest and observed a cracked plastic bracket.  [ECF No. 99 at 22].  Costa also

23

maintains that she has retained the deployed headrest at issue and plans to have it inspected to determine the cause of failure.  [Id.].

Third, while there is no doubt that an expert opinion is preferred to prove medical causation, Jackson v. Johnson & Johnson & Janssen Pharms., Inc., 330 F. Supp. 3d 616, 625 (D. Mass. 2018), the Court will not grant summary judgment against a plaintiff on this basis where the alleged injury (force to the head causing neck pain) is simple enough that a layperson could determine causation without expert assistance, see Márquez-Marín v. Garland, No. 16-cv-01706, 2021 WL 3557695 at *3 (D.P.R. Aug. 11, 2021) ("Expert testimony usually is necessary to establish a causal connection between an injury and its source 'unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile.'" (citation omitted)); Pitts v. Wingate At Brighton, Inc., 972 N.E.2d 74, 79 (Mass. App. Ct. 2012) ("No expert testimony is necessary for lay jurors to appreciate that allowing a nursing home patient to fall to the floor could cause a broken bone."). Cf. Pritchard v. Stanley Access Techs., LLC, No. 08-cv-11762, 2011 WL 309662, at *5 (D. Mass. Jan. 27, 2011) (expert medical testimony required because of plaintiff's complex medical history).[10]  In sum, Costa has raised just enough triable facts to survive summary judgment on her negligence claim.

## IV.   MOTION FOR CLASS CERTIFICATION

Having found that Soares' claim survives summary judgment, the Court must also consider whether the claim is amenable to class treatment.  Soares moves for certification of two overlapping classes—a damages class and an injunctive class—of owners and lessees of FCA vehicles that contain the defective AHRs.  [ECF No. 62].

---

[10] Nevertheless, Costa suggests that she may still retain an expert witness for medical causation as the deadline for disclosure of expert witnesses has not yet passed.  See [ECF No. 99 at 21].

The proposed Rule 23(b)(3) Class ("Damages Class") includes: All persons in Massachusetts who currently own or lease, or who have owned or leased, any Class Vehicle manufactured by FCA or any of its subsidiaries or affiliates that is equipped with an AHR system.  [ECF No. 62 at 1].[11]

The proposed Rule 23(b)(2) Class ("Injunctive Class") includes: All persons in Massachusetts who currently own or lease any Class Vehicle manufactured by FCA or any of its subsidiaries or affiliates that is equipped with an AHR system.  [ECF No. 62 at 1].

## A.    Legal Standard

To obtain class certification under Federal Rule of Civil Procedure 23, a plaintiff must first satisfy the four requirements of Rule 23(a).  They must demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 (2011).  "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiffs claims."  Id. (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982) (internal quotation marks omitted)).

Because Soares seeks money damages, he must also satisfy Rule 23(b)(3)'s predominance and superiority requirements.  See Tyson Foods, Inc. v. Bouaphakeo, 577 U.S.

---

[11] The Class Vehicles are defined as the following: 2010-2018 Dodge Journey, 2010- 2011 Dodge Nitro, 2010-2012 Jeep Liberty, 2010-2017 Jeep Patriot or Compass, 2010-2012 Dodge Caliber, 2010-2018 Dodge Caravan, 2011-2018 Dodge Durango, 2011-2018 Jeep Grand Cherokee, and 2010-2014 Sebring/Avenger.  [ECF No. 62 at 1].

442, 453 (2016).  Rule 23(b)(3) requires a showing that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The aim of the predominance inquiry is to test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'"  In re Asacol Antitrust Litig., 907 F.3d 42, 51 (1st Cir. 2018) (quoting Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469–70 (2013)).

In addition to the explicit requirements of Rule 23, there is also an implicit requirement that the proposed class be ascertainable.  Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 9 (D. Mass. 2010).  A class is generally ascertainable where it is defined in terms of an "objective criterion."  Matamoros v. Starbucks Corp., 699 F.3d 129, 139 (1st Cir. 2012).  "[I]t must be 'administratively feasible for the court to determine whether a particular individual is a member.'"  Donovan, 268 F.R.D. at 9 (quoting Kent v. SunAmerica Life Ins., 190 F.R.D. 271, 278 (D. Mass. 2000)).  The class proposed here is clearly ascertainable.

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule."  Wal-Mart Stores, 564 U.S. at 350.  The Court must engage in a "rigorous analysis," which may involve "prob[ing] behind the pleadings" in order to decide whether certification is appropriate.  Id. at 350–51 (quoting Gen. Tel. Co. of Sw., 457 U.S. at 160–61).  Although not controlling in considering class certification under Rule 23, the Court is mindful of the Commonwealth's "general legislative policy favor[ing] class actions" in Chapter 93A cases.  See Bellerman v. Fitchburg Gas & Elec. Light Co., No. 09-cv-00023, 2013 WL 485670, at *7 (Mass. Super. Jan. 7, 2013).

26

**B.      Discussion**

       1.      <u>Numerosity</u>

The numerosity requirement, easily met here, is satisfied when the class is "so numerous

that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "'[T]he party instituting

the action need not show the exact number of potential members in order to satisfy' the

numerosity prerequisite, but she 'does bear the burden of showing the impracticability[,] and

mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1).'"

<u>Swack v. Credit Suisse First Bos.</u>, 230 F.R.D. 250, 258 (D. Mass. 2005) (quoting 7A Charles

Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762 (3d ed.

2004)).  Here, the proposed classes consist of the Massachusetts buyers or lessees of

approximately 116,080 Class Vehicles that are equipped with the defective AHRs, sold from

2010–2018.[12]  [ECF No. 62-1 at 19].  Joinder of this number of people would be impracticable.

<u>See</u> <u>Garcia v. E.J. Amusements of N.H., Inc.</u>, 98 F. Supp. 3d 277, 285 (D. Mass. 2015), <u>appeal</u>

<u>dismissed</u> (Nov. 10, 2015) (Courts have generally found that the existence of 40 or more relevant

individuals satisfies the numerosity requirement.).

       2.      <u>Commonality</u>

Commonality, and the related predominance requirement, are at the core of FCA's

challenge to class certification.  [ECF No. 72 at 18].  The commonality requirement is met when

"there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Rule 23(a)'s

requirement of commonality is a low bar, and courts have generally given it a 'permissive

application.'"  <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6, 19 (1st Cir.

2008) (citation omitted).  "[T]he commonality requirement is met where the 'questions that go to

---

[12] At other times, the relevant time frame is alleged to be 2010 to 2019.  <u>See</u> [ECF No. 62-1 at 8]

the heart of the elements of the cause of action' will 'each be answered either "yes" or "no" for

the entire class' and 'the answers will not vary by individual class member.'" Garcia v. E.J.

Amusements of N.H., Inc., 98 F. Supp. 3d 277, 285 (D. Mass. 2015) (citing Donovan v. Philip

Morris USA, Inc., No. 06-cv-12234, 2012 WL 957633, at *21 (D. Mass. Mar. 21, 2012)).  "In

general, where 'implementation of [a] common scheme is alleged, the commonality requirement

usually is satisfied.'" Tigges v. AM Pizza, Inc., No. 16-cv-10136, 2016 WL 4076829, at *7 (D.

Mass. July 29, 2016) (quoting Overka v. American Airlines, Inc., 265 F.R.D. 14, 18 (D. Mass.

2010)).

    The Court finds that Soares has identified a number of common questions, including the

following: whether the AHR design is defective; whether that defect gives rise to a safety risk;

whether FCA was aware of the defect; and whether FCA failed to disclose information in

violation of Chapter 93A, including whether that nondisclosure was material to a reasonable

buyer.

     FCA contends that there are no common questions in this case because the appearance of

the defect, and the associated safety risk, varied across vehicles and thus requires an

individualized inquiry.  [ECF No. 72 at 19–21].  Soares, however, has presented sufficient

evidence that the AHR system and design was uniform across all Class Vehicles, regardless of

how the defect manifested.  [ECF No. 62-1 at 8–10, 20–21].  Thus, the central liability as to all

claims—whether the AHR design that is indisputably present in all Class Vehicles was defective

such that it is susceptible to ESC and inadvertent deployment—rests on common proof, which

includes, for example, documentation and testimony applicable to the manufacture and sale of

the AHR system.  See S. States Police Benevolent Ass'n, Inc. v. First Choice Armor & Equip.,

Inc., 241 F.R.D. 85, 87–88 (D. Mass. 2007) (finding that the lenient commonality requirement is "clearly" met where all putative class members purchased the same allegedly defective product).

        3.      Typicality and Adequacy

Because the analysis of typicality and adequacy overlap, the Court addresses them together.  See In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 22–23 (D. Mass. 2008) ("The requirements of typicality and adequacy tend to merge . . . .").  Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "The typicality requirement is satisfied when the [named] plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims, and when the plaintiff's claims and those of the class are based on the same legal theory." Guckenberger v. Bos. Univ., 957 F. Supp. 306, 325 (D. Mass. 1997) (internal quotation omitted); see also In re Lupron Mktg. & Sales Prac. Litig., 228 F.R.D. 75, 89–92 (D. Mass. 2005).

In this case, the complained-of injuries arose from the same events and course of conduct; namely, the alleged AHR defect and FCA's concealment of that defect.  The fact that the manifestation of the alleged defect may have varied between Soares' car and the cars of other proposed class members does not defeat typicality here.  See Iannacchino v. Ford Motor Co., 888 N.E.2d 879, 882 (Mass. 2008) ("[T]he lack of accident-related injury or manifested defect" does not bar recovery where "plaintiffs do not allege that [the product] ever malfunctioned or that they have sustained any personal injury or property damage[]" but instead claim that the seller's alleged practice of knowingly manufacturing and selling defective products was unfair or deceptive and injured the plaintiffs economically.).  Soares, like every other member of the proposed class, was a purchaser of a vehicle from FCA that had the AHR system installed, and

alleges he suffered economic injuries as a result.  Further, all of the claims are based on the same

legal theory—that FCA knew about the defect and did not inform consumers about the potential

for an unexpected deployment.  For these reasons, Soares has met Rule 23's typicality

requirement.

The Court also concludes that he has shown that he can "fairly and adequately protect the

interests of the class[,]" therefore meeting the adequacy requirement.  Fed. R. Civ. P. 23(a)(4).

The necessary showing has two parts: "first that the interests of the representative party will not

conflict with the interests of any of the class members, and second, that counsel chosen by the

representative party is qualified, experienced, and able to vigorously conduct the proposed

litigation."  In re Lupron, 228 F.R.D. at 90 (quoting Andrews v. Bechtel Power Corp., 780 F.2d

124, 130 (1st Cir. 1985)).  "Adequate representation is particularly important because of the *res

judicata* implications of a class judgment."  Andrews, 780 F.2d at 130.

First, Soares represents that he has actively participated in the litigation thus far and will

continue to do so; his alleged injury is the same as the proposed class; and there is no apparent

conflict between his interests and the other proposed class members.  See [ECF No. 62-1 at 24].

Second, Soares has shown that proposed class counsel are qualified, experienced, and have

extensive knowledge of the applicable law.  [Id.; ECF Nos. 62-37; 62-34].  The Court is satisfied

that counsel can adequately and fairly represent class interests.

4.    Predominance

The Court has already concluded that Soares has identified multiple significant issues of

law and fact, and, despite FCA's contentions, it also concludes that those common questions

predominate over individual issues.  The predominance requirement is met when "the court finds

that questions of law or fact common to class members predominate over any questions affecting

30

only individual members." Fed. R. Civ. P. 23(b)(3).  The predominance requirement is more

demanding than the commonality requirement, though it does not require complete uniformity.

In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 3 n.5 (1st Cir. 2005); In re Evergreen Ultra Short

Opportunities Fund Sec. Litig., 275 F.R.D. 382, 392 (D. Mass. 2011).  Plaintiffs must show that

"the proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" Overka,

265 F.R.D. at 19 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)).  The

First Circuit has instructed, however, that classes like this one that are made up of consumers

"are especially likely to satisfy the predominance requirement."  Smilow v. Sw. Bell Mobile

Sys., Inc., 323 F.3d 32, 41 n.9 (1st Cir. 2003) (citing Amchem, 521 U.S. at 625 (observing that

the predominance requirement is especially likely to be satisfied in consumer fraud actions); see

also In re Evergreen, 275 F.R.D. at 393.

The Court concludes that the Chapter 93A claim meets the predominance test for the

reasons stated by Soares and set forth in the preceding discussions of commonality and

typicality.  Here, the class claims all arise from FCA's uniform conduct regarding the

manufacture and sale of AHR systems, and the evidence needed to establish a Chapter 93A

violation will be common to all class members, including whether the AHR system was

defective, the defect's impact on safety, what FCA knew, when it knew it, and what it did or did

not disclose.

FCA maintains that the claims will require the resolution of substantial individual issues,

[ECF No. 72 at 26–28], but the Court finds that the key liability questions overwhelmingly rest

on common proof.  FCA's additional assertion that the class should not be certified because

certain class member claims may be barred by the statute of limitations fares no better.  [Id. at

28].  It is well-established that certification is not precluded by the possibility of individual

questions of fact that may arise in the context of affirmative defenses.  Smilow, 323 F.3d at 39

("[W]here common issues otherwise predominated, courts have usually certified Rule 23(b)(3)

classes even though individual issues were present in one or more affirmative defenses.")

(citations omitted); see also S. States Police Benevolent Ass'n, Inc., 241 F.R.D. at 89.

      Accordingly, the predominance requirement under Rule 23(b)(3) is satisfied.  See Alger

v. FCA US LLC, 334 F.R.D. 415 (E.D. Cal. 2020) (in certifying class of California purchasers

for claims resting on this same defect, the court found that "the predominance of common issues

is 'readily apparent.'" (citation omitted)).[13]

      5.    Damages

      FCA's argument that Soares' theory of class damages is inadequate is also unavailing.

[ECF No. 72 at 29].  Soares' expert, Susan Thompson ["Thompson"], opines that "[c]lass

[m]embers had been damaged because when they purchased their vehicles, they bargained for a

vehicle that did not contain an inadequate AHR system, but that is what they received."  [ECF

No. 62-66 (Thompson Rpt.) at 7]; see also [ECF No. 62-1 at 27–28; ECF No. 88 at 16–18].

Accordingly, under her proposed damages model, she opines "that for each class member to

receive the 'benefit of their bargain,' they should receive sufficient compensation to allow them

to purchase two new headrests that are not at risk of Unexpectedly Deploying."  [ECF No. 62-1

at 28; Thompson Rpt.].

      This benefit-of-the bargain theory of economic damages has been affirmed by the

Massachusetts Supreme Judicial Court in Chapter 93A cases involving misrepresentations.

Crane v. Sexy Hair Concepts, LLC, No. 17-cv-10300, 2017 WL 8728961, at *4 n.3 (D. Mass.

---

[13] The Court notes that it is free to modify or decertify a class if warranted by subsequent
developments in the litigation.  Smilow, 323 F.3d at 41.

Oct. 10, 2017).  "This rule is particularly appropriate where . . . 'the person who was the target of the misrepresentation has actually acquired something in a transaction that is of less value than he was led to believe it was worth when he bargained for it."  Passatempo v. McMenimen, 960 N.E.2d 275, 292 (Mass. 2012) (quoting Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 837 N.E.2d 1121, 1135 (Mass. 2005).

In accordance with this theory of damages, Thompson's straightforward model seeks to "place the aggrieved buyer in the same position as performance would have done."  Productora E Importadora De Papel v. Fleming, 383 N.E.2d 1129, 1137 (Mass. 1978).  FCA's critiques do not render Thompson's theory of damages unsatisfactory, especially where similar replacement cost models have been accepted by courts, see Nguyen v. Nissan N. Am., Inc., 932 F.3d 811, 821 (9th Cir. 2019), including Thompson's very same model in Alger, see Alger, 334 F.R.D. at 430 ("[W]hether the proposed calculation is accurate, whether the AHR was actually defective and whether Defendant knew of the defect 'are merits inquiries unrelated to class certification.' For now, Plaintiff has sufficiently established a nexus between his theories of liability and his damages model." (citations omitted)).

Furthermore, the fact that individual damages issues may exist does not defeat class certification.  In re Nexium Antitrust Litig., 777 F.3d 9, 21 (1st Cir. 2015) ("[It] is well-established that '[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).'"); George v. Nat'l Water Main Cleaning Co., No. 10-cv-10289, 2014 WL 1004109, at *4 (D. Mass. Mar. 17, 2014) ("[T]he focus remains on the predominance of common issues and answers upon the class members and not the absence of any individualized damages analysis.").

6.      Superiority

Finally, Soares has shown "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Here, in light of the above analysis, judicial economy will be served by allowing this matter to proceed as a class action, rather than consolidated or individual actions.  Further, it is unlikely that individuals would litigate these cases alone.  "[A] class action is particularly superior where class treatment can vindicate the claims of 'groups of people whose individual claims would be too small to warrant litigation.'" Henderson v. Bank of New York Mellon, N.A., 332 F. Supp. 3d 419, 429–30 (D. Mass. 2018) (quoting Smilow, 323 F.3d at 41).  Given that each member of the class is seemingly seeking a relatively small amount of money in comparison to the costs of litigating on an individual basis, a class action is the superior method of resolving these claims.  "The core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." Smilow, 323 F.3d at 41; see also Weld v. Glaxo Wellcome Inc., 746 N.E.2d 522, 532 (2001) ("[A] classic illustration of the policies of judicial efficiency and access to courts that underlie the consumer class action suit" is one that "aggregates numerous small claims into one action, whose likely range of recovery would preclude any individual plaintiff from having his or her day in court.").

7.      Injunctive Class

Soares seeks certification of an Injunctive Class, in addition to the Damages Class discussed above.  The former class seeks to "pursue an injunction requiring [FCA] to replace all defective headrests with non-defective headrests."  [ECF No. 62-1 at 30].  FCA argues that the request for certification of the Injunctive Class should be denied because Soares has an adequate

remedy of law in the form of monetary damages, and the equitable relief may vary among class members.  [ECF No. 72 at 32].

Rule 23(b)(2) "'does not authorize class certification when each class member would be entitled to an individualized award of money damages.'"  Schonton v. MPA Granada Highlands LLC, No. 16-cv-12151, 2019 WL 1455197, at *9 (D. Mass. Apr. 2, 2019) (citing Wal-Mart Stores, 564 U.S. at 360–61).  Here, Soares seeks this injunctive relief in addition to the benefit-of-the-bargain damages.  Accordingly, certification under Rule 23(b)(2) is inappropriate.  See id. (denying certification under Rule 23(b)(2), in part, because plaintiffs sought monetary and injunctive relief); see also Philips v. Ford Motor Co., No. 14-cv-02989, 2016 WL 7428810, at *23–24 (N.D. Cal. Dec. 22, 2016) (denying certification of a Rule 23(b)(2) class that sought to require the motor company to "repair and/or replace" the defective system in class vehicles where plaintiff also sought certification under a Rule 23(b)(3) on a benefit-of-the-bargain theory of monetary damages); Walsh v. Ford Motor Co., 130 F.R.D. 260, 266 (D.D.C. 1990) (refusing to certify a Rule 23(b)(2) class for a "recall and retrofit" of vehicles on the grounds that the "monetary damages [were] more suitable in this litigation, particularly in view of the practical limitations which the proposed equitable relief presents.").

V.    **CONCLUSION**

Accordingly, FCA's motions to exclude expert testimony, [ECF Nos. 84, 86], and motion for summary judgment, [ECF No. 82], are DENIED.  Soares' motion to certify class, [ECF No. 62-1], is GRANTED as to the Rule 23(b)(3) Damages Class and DENIED as to the Rule 23(b)(2) Injunctive Class.

Pursuant to Federal Rule of Civil Procedure 23(c)(1)(B), which requires the class certification order to "define the class and the class claims, issues, or defenses," the class is certified as follows:

> The "Chapter 93A Class": All persons in Massachusetts who currently own or lease, or who have owned or leased, any Class Vehicle manufactured by FCA or any of its subsidiaries or affiliates that is equipped with an AHR system.

Pursuant to Rule 23(g) and for the reasons discussed above, the Court appoints Soares as class representative and the law firms of Justice Law Collaborative, LLC; Lieff, Cabraser, Heimann & Bernstein, LLP; and Kershaw, Cook & Talley, PC as class counsel.

Accordingly, Soares is directed to prepare a notice plan, consistent with Fed. R. Civ. P. 23(c) and 23(d) to be submitted to the Court on or before October 25, 2022.  Soares is to consult with FCA and if no agreement can be reached, FCA may submit objections on the date the notice plan is due.  FCA is ordered to cooperate with Soares to provide a list of all customers and any additional information in its possession or control that would aid in identifying Class members for the purpose of preparing the notice plan.

**SO ORDERED.**

September 30, 2022                                          /s/ Allison D. Burroughs
                                                           ALLISON D. BURROUGHS
                                                           U.S. DISTRICT JUDGE